NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY, Plaintiff in Error, v. PEGGY FLORENCE PERRY, By Next Friend, Defendant in Error.

Middle Section. April 14, 1931.

Petition for Certiorari denied by Supreme Court, July 1, 1931.

Fitzgerald Hall and Walton Whitwell, both of Nashville, and George E. Banks, of Winchester, for plaintiff in error.

Frank L. Lynch, of Winchester, for defendant in error.

DeWITT, J. This action for damages for personal injuries to the infant plaintiff, Peggy Florence Perry, resulted, upon the second trial, in a verdict and judgment for $2500 against the Railway. Upon the first trial a verdict for $2000 was set aside by the Circuit Judge because he could not rest satisfied with the verdict. Upon the second trial he stated that the case had given him a great deal of concern, but that he would overrule the motion of defendant for a new trial. Thereupon a motion in arrest of judgment was made, and on the next day it was heard and overruled. Then occurred the following colloquy between His Honor and the counsel:

"THE COURT: Do you gentlemen ask me to put in the record the reasons I stated for overruling the motion for a new trial?

"MR. BANKS: The reporter has a statement you made yesterday morning.

"THE COURT: I started to say this, you can get it on record, that this case has given me a great deal of concern about the facts which it has, and I pondered over it quite a bit. In this case I became the twenty-fifth juror rather than the thirteenth, and the weight of the finding of twenty-four

men left me in doubt in my mind as to the facts, and I took that into consideration, and became satisfied to overrule the motion."

The rule is invoked that the appellate court will not sustain a challenged judgment where the Trial Judge did not approve the verdict of the jury. In Railway Company v. Mahoney, 89 Tenn., 310, 331, 15 S. W., 652, the rule was stated by Chief Justice Snodgrass as follows:

"If, upon a first or second trial, the Circuit Judge is dissatisfied, because the evidence does not preponderate in favor of the verdict, or does not support it, though there was some evidence upon which it might have been based, it is his duty to set it aside, and we do so if it appears he did not approve it and yet permitted it to stand."

This rule was applied in Turner v. Turner, 85 Tenn., 387, 3 S. W., 121; Telephone & Telegraph Co. v. Smithwick, 112 Tenn., 463, 79 S. W., 803; Hurt v. Railroad, 140 Tenn., 623, 205 S. W., 437. These were cases in which the trial judges expressed positive disapproval of the verdicts. In the following cases the judgments were reversed and new trials were ordered, because the trial judges expressed neither approval nor disapproval of the verdicts: Railroad v. Lee, 95 Tenn., 387; 18 S. W., 268; Curran v. State, 157 Tenn., 7, 4 S. W. (2d), 957; Hamburger v. R. R., 138 Tenn., 123, 196 S. W., 144.

In the Smithwick case, supra, it was declared that if the circuit judge is dissatisfied with the verdict of the jury, and if, from his statements it appears that he was really not satisfied with it, it becomes the duty of the appellate court, when it has acquired jurisdiction of the cause, to do what the circuit judge should have done; that is, to grant a new trial on the ground of the dissatisfaction of that judicial officer with the verdict. The reasons for the rule are fully set forth in this and other decisions. In the Hamburger case, the Court said: "We must know that the verdict of the jury has the approval of his judgment and his conscience. The judgment upon the verdict is not an idle ceremony, but is intended to convey to this court the approval of the trial judge of the weight and credibility of the witnesses as fixed by the verdict of the jury."

In Turner v. Turner, supra, it was said:

"The rule, and the reasons for it, are well stated in the case of England v. Burt, 4 Hum., 401-2, and need not be repeated here. In that case the judgment was allowed to stand because the Circuit Judge only stated that 'he did not know whether if he had been of the jury he would have considered the evidence sufficient,' etc. But here it appears clearly that the Judge thought the preponderance was against it, and merely deferred to the judgment of the jury. This must not be allowed.

Otherwise this court would sit in each case in the relation of the Circuit Judge to each verdict and trial and he would be but the medium through which the case was passed to us for consideration, requiring this Court to act under the rule operative upon the Circuit Judge to weigh the evidence and determine where the preponderance was, instead of under the rule long settled by this Court to determine the case by affirming his judgment when it was upon a verdict sustained by any legal evidence which was sufficient to authorize it.''

The pivotal point in that case was that the circuit judge only allowed the verdict to stand because the jury had rendered it. He did not exercise that independent judgment which is necessary to complete the exercise of the functions of trial judge and jury. If he does not do so he does not act as a thirteenth juror. He must be satisfied as well as the jury—not because the jury is satisfied, but because he is satisfied. ''This view is based not only upon the supposition that the jury has considered and passed upon the fact, but also that the parties have had the benefit of the trained intelligence of the circuit judge as well.'' Telephone & Telegraph Co. v. Smithwick, supra.

It is clear from these decisions that upon the first or second trial, the circuit judge is not at liberty to overrule a motion based upon the preponderance of the evidence unless he, in his own judgment and conscience, approves the verdict of the jury thereon.

Now, in the case before us, the Circuit Judge did say that he became satisfied to overrule the motion; but it is evident that he reached this conclusion because of the verdicts of two juries. In our opinion this did not satisfy the requirements of the law, and the judgment, on this ground, alone, would have to be reversed and the cause remanded for a new trial. But it is insisted that there is no evidence to sustain the verdict, and that the Railway's motion for a directed verdict in its favor, made at the close of all the evidence, should have been sustained.

The action was tried to the jury alone on the fourth or common law count of the declaration, in which it was averred that the plaintiff approached the crossing in a two-horse wagon and within a reasonable and lawful distance therefrom the driver stopped his team and looked and listened for trains; that said driver thus complied with the law and while exercising due care, prudence and caution, having neither observed nor heard any train, was in the act of driving across the Railway tracks, ''when suddenly and without warning one of defendant's locomotives bore down upon the plaintiff and the other occupants of said wagon approaching them from the north (the track running practically north and south and the highway east and west) and when within a few feet of plain-

tiff, the driver of the wagon in an effort to avert and avoid an accident turned his team to the left, from all of which the plaintiff was thrown from the wagon and run over." It was also averred that the Railway was then and there guilty of gross negligence in the operation of its said locomotive in that its servants in charge of said locomotive were operating the same down Cumberland Mountain around a curve, which cut off the view of said public crossing, knowing full well at the time that said crossing was just south of the curve, and that many people crossed its tracks at said point daily; and that they were running "so silently and noiselessly and at a rate of speed, all of which combined, gave those using the pike no opportunity to get out of the way of said engine and avoid an accident; that this was a much used and frequented crossing, and defendant's reckless, careless and negligent operation of its said engine at the said time was the proximate cause of the accident."

The testimony relied on as supporting the verdict and judgment is as follows:

The accident occurred at a crossing of a State highway over three tracks of the defendant Railway, about one mile north of Sherwood. These tracks are about seven or eight feet apart. It is well known as a dangerous crossing. The railway tracks run southwardly down a grade on a considerable curve on the east, or inside, of which is a steep bluff about ten or twelve feet from the eastern track. The eastern track is used for northbound trains, the western track for those southbound, and the middle track is called the pusher track. North of the crossing 271 feet was a block signal,—a tower on the west side of the railway with a semiphore, an arm which operates by electrical force so as to show the situation ahead—showing a red light for danger, a yellow light for caution and a green light for safety. The Railway operated a large pusher engine from Cowan southward, so as to assist trains in getting over the mountain grade between Cowan and this crossing. This engine, on a morning in July, 1928, was backing southward on the west track, at a rate of speed which is not shown. As it neared the crossing it stopped. Several of plaintiff's witnesses testified that it stopped thirty feet from the crossing, but the driver of the wagon, Pendergrass, testified that the stop occurred at the crossing, but he admitted that he was so scared that he did not know just what happened. Certain of the plaintiff's witnesses testified that they heard no whistle blown or bell rung, and that had such been done they would have heard it; while other witnesses for the plaintiff testified that a distress whistle was given at the place of the block signal. The complaint is that the engine came around the curve noiselessly at a rate of speed which gave

to those crossing on the highway no opportunity to get out of th. way of the engine and avoid an accident.

A wagon drawn by a horse and a mule approached the crossing from the east. The driver, Jim Pendergrass, an uncle of the plaintiff child, sat on a board seat, on which a twelve-year-old girl, Bertha Ferguson, also sat, holding the child, Peggy Perry, then about four months old. On the wagon were also the baby's mother and her four other children. At a point about ten or twelve feet from the eastern track, the driver stopped the team, looked up and down the track, but did not see or hear any train coming. He said that at that point he could not see the block signal. He heard no bell or whistle. He said that he would have heard it if there had been any sound of bell or whistle. He then drove across the eastern track and came on the middle, or pusher, track. Mrs. Perry and Pendergrass testified that they were about midway of the three tracks when the accident occurred. Pendergrass testified that although he kept looking he did not see the oncoming engine until it was about thirty or forty feet from the crossing. All of them became badly frightened. Pendergrass undertook suddenly to turn his team to the left to avoid the crossing of the west track. The horse and mule tried to run away. The left front wheel tilted up the bed of the wagon and the little girl and the baby were thrown off on the ground. The baby's arm was broken in two places and mashed, so that it is finally crooked and stiff.

The engine had stopped before reaching the crossing. There was no collision.

There is testimony that the engine did not stop at the block when it signalled danger, though the engineer, fireman and brakeman testified that it did stop there and that the accident occurred in their full view while the engine was at the block signal; and that it came on down to the place near the crossing after the accident occurred.

Tom Wallace testified that he served as a flagman at this crossing when the highway was being constructed. On direct examination he said that his post of duty was on the east side of the track; that from the point ten or twelve feet east of the track (the point where the wagon first stopped) one could see about sixty feet up the track and only from a wagon could one see even the top of the signal tower; that this was due to the sharp curve and the bluff on the inside of it; that the driver of the wagon, in order to see the block signal, must have his wagon on the first track and the team on the middle track. On cross-examination he admitted that sixty feet was only an estimate; that he had never measured the distance; that he could not tell exactly how far one could see from that point up the track. He was asked if one could not see the

block tower as far back as forty feet from the track, and answered that he did not know, he had never examined that. Pendergrass testified that he thought that one had to get on the crossing to see the block signal.

The engineer testified that he was familiar with the crossing, having passed it ten thousand times; and that it was considered a dangerous crossing. When he first saw this wagon and team it was on the crossing. Photographs taken by the Railway's photographer show the block signal tower as visible from points east of the eastern track. One of these photographs from a point forty feet therefrom shows a clear line of vision to the block tower, with the bluff not obscuring the view. Another, from a point twenty feet away, shows the block tower at full length; another, from a point thirteen feet away, shows the tower and the track for a few feet north of it. These photographs are questioned on the ground that they were taken from improper angles and do not present the views accurately. There is no evidence to sustain this insistence. It is not questioned that all the objects and distances shown in the photographs are the same as they were at the time of the accident. The photographs were, of course, admissible as evidence. It is impossible for anyone reasonably to conclude, from viewing these photographs, that from the point where the wagon was first stopped the driver could not see the block signal tower, which was two hundred and seventy-one feet north of the crossing. The photographs, therefore, demonstrated the absolute untruthfulness of the oral testimony that from that point one could not see the block signal tower. The physical facts contradict the statement of Pendergrass that he looked and listened. If he had done so he must have seen the approaching engine in time to avoid coming so near the crossing of the western track. Railroad v. Justice, 5 Higgins, 69; Klein v. Railroad Co., 4 Tenn. App., 563.

Actionable negligence claimed is a combination of failure to give warning and running at an unreasonable speed under all the circumstances. There is no evidence from which the jury could reasonably infer that the engine was running at an unreasonable rate of speed. It was stopped before it could reach the crossing. Plaintiff's witness, Joe Pack, who was one hundred yards or more away, testified that the engine was traveling slowly, then said it was "not running so fast, or so slow either." This statement has no probative value. It is no evidence of negligent speed. Johnston v. Railway, 146 Tenn., 135, 240 S. W., 429.

The accident was not due to fright of the animals but to the act of the driver in turning them suddenly to the left and upsetting the board seat on the wagon. The insistence is made that the driver was by the Railway negligently placed in an emergency re-

quiring him to do what he did to avoid a collision. His attempt to turn was made on the middle track, which was seven or eight feet from the track on which the engine was running. We repeat that the engine stopped at a place north of the crossing. The doctrine of nonimputability of negligence of the driver to the child would not apply so as to entitle her to recover unless the defendant Railway was guilty of negligence. The right of the plaintiff to recover would turn also upon the question whether or not the driver negligently placed himself in the position of emergency. A failure on the driver to guard against danger would deprive the plaintiff of the right to claim that the driver was put in sudden peril. Cullom v. Glasgow, 3 Tenn. App., 443. The rule is that where there was a fixed condition of danger apparent to the driver of the vehicle, he must be held to guard against it; that where the danger is incident to the place, its use or surroundings, then such danger is not sudden peril within the meaning of the law; but a danger to be anticipated and guarded against by proper care and caution. The railroad track itself is a warning of danger. Railway Company v. Whitlock, 136 Tenn., 266, 188 S. W., 1151; Railroad Co. v. Hayes, 9 Tenn. App., 116. It is the duty of the driver of a vehicle attempting to cross railway tracks to see and hear what can be seen and heard and he is bound by what he would see and hear. In order to sustain the application of the rule of emergency there must be evidence that the emergency was produced by the wrongful conduct of the defendant, and if it was produced by the negligent conduct of the driver of the wagon and not by the negligence of the defendant the plaintiff cannot recover. It must be borne in mind that the case is not based upon violation of statute. The undisputed evidence is that the engineer was on the lookout; that when he saw the driver of the wagon persisting in trying to cross the track he blew his whistle and stopped the engine. What else could he do to avoid a collision? The sound of the whistle was a warning to the driver and would operate to cause him to take precaution for his safety. If unnecessarily loud noises had been made by the engine it would most likely have aggravated the danger by causing the animals to take fright and run away.

Engineers have a right under normal conditions to assume that persons approaching a grade crossing will stop and will become aware of the approach of a train. If the traveler persists in producing a perilous situation and the train while not running at an unreasonable speed is stopped and a collision is avoided, how can one reasonably conclude that the Railway is negligent? There is no proof of any abnormal, unusual, unnecessary or malicious act upon the part of the Railway. In our opinion it could not be reasonably concluded that the injury to the child was the proximate

276

result of any wrongful act or omission on the part of the Railway, but it was the proximate result of the act of the driver in failing to exercise proper caution and in suddenly turning his team to the left and throwing the two children on the ground.

It results therefore that the Trial Judge was in error in refusing to grant the motion for peremptory instructions. The judgment of the Circuit Court is reversed, the verdict set aside and the suit is dismissed at the cost of the next friend.

Crownover, J., and Higgins, Sp. J., concur.