## GARIS v. EBERLING.—71 S. W. (2d) 215.

Middle Section. January 25, 1934.

Petition for Certiorari denied by Supreme Court, May 19, 1934.

2

4

Hume & Armistead and Walter Stokes, all of Nashville, for plaintiff in error.

White & Howard, of Nashville, for defendant in error.

FAW, P. J. E. J. Eberling, as administrator of his infant daughter, Sylvia Joy Eberling, obtained a verdict for $10,000 and a judgment thereon in the circuit court of Davidson county against Roy L. Garis, defendant below, and after his motion for a new trial was overruled, Roy L. Garis appealed in error to this court and is here insisting, through assignments of error and briefs and oral argu-

ments by able counsel, that there is no evidence to support the verdict and for that reason the trial court should have sustained the defendant's motion for a directed verdict at the close of all the evidence.

It is further insisted that if the court should be of opinion that there was evidence to support a verdict for plaintiff, that the amount of the verdict is excessive, and so excessive as to indicate prejudice, passion, and caprice on the part of the jury.

There are other assignments of error, some of which challenge certain instructions to the jury as erroneous; others complain of the trial court's refusal to give the jury requested instructions; and one asserts that the trial judge erred, to the prejudice of the defendant below, in certain remarks or comments made by him in connection with his ruling upon an objection to testimony.

As a matter of convenience, we will designate the parties as they appear on the record of the trial court: E. J. Eberling, administrator, etc., as plaintiff; and Roy L. Garis as defendant.

Plaintiff's declaration contains two counts. The background out of which this action arose is well stated in the declaration, and in order that this, as well as the plaintiff's averments of negligence, may be seen, we will quote the declaration.

The first count is as follows:

"The plaintiff, E. J. Eberling, Administrator of the estate of Sylvia Joy Eberling, sues the defendant Roy L. Garis, for the sum of Twenty-Five Thousand ($25,000) Dollars damages and for cause of action states:

"That the deceased, Sylvia Joy Eberling, died on or about May 6, 1932, at the tender age of about five and one-half years, as the direct and proximate result of the negligence and carelessness of the defendant as hereinafter shown. That the deceased is survived by her mother and her father, the plaintiff herein, and several brothers and sisters. That the plaintiff, E. J. Eberling, is the duly appointed and qualified administrator of the estate of the said Sylvia Joy Eberling.

"That on May 6, 1932, and for many months prior thereto, the deceased lived in the home of her father and mother, located on the southerly side of Bellwood Avenue, within the city limits of Nashville, Tennessee. That the said defendant Garis also lived in a residence located on the southerly side of said Bellwood Avenue, and the residence of the defendant being about 100 feet to the east of the plaintiff's residence. That it had been customary for many months for the deceased to play with the children of the defendant in the yards and on the premises of both the residences of the plaintiff and the defendant. That the deceased child at the time of receiving the injuries from which she died, was on the premises

of the defendant playing with the children of the defendant, at the invitation of the defendant and his wife.

"That the lots along the southerly side of Bellwood Avenue, and especially the lot upon which the defendant's residence is located, slopes up on a steep grade beginning at the street and increases in height toward the rear of the lot. The private driveway of the defendant's residence enters from Bellwood Avenue, extends from the street in a southerly direction along the side of the west side of the defendant's house and back behind the rear of his house to a garage, which garage is located about 20 feet to the rear of the rear wall of the defendant's residence. Defendant's side driveway conforms to the steep grade of his lot, and said driveway is therefore on a steep grade, beginning at the garage and running steeply down grade along side of his residence and into Bellwood Avenue.

"The defendant, Roy L. Garis, at the time of the injury inflicted upon the deceased, was the owner of a high powered, heavily built Studebaker Sedan automobile, which was used by the defendant for the pleasure and business of himself and his family. That the defendant had driven said automobile on many occasions previous to the time of the injuries to the deceased, and the defendant well knew, or by the exercise of ordinary care should have known, of the defective and unsafe condition of the brakes on said automobile, and especially the defective and unsafe condition of the emergency brake or bank brake on said automobile, as hereinafter shown. That the defendant had on many occasions driven his said automobile into and out of his said private driveway, and well knew the steep grade of said driveway extending from his private garage down toward Bellwood Avenue. The defendant well knew, or by the exercise of ordinary care should have known, that it was unsafe to park his automobile on said driveway, and especially unsafe to leave his automobile unattended on said driveway with children playing about the premises, and no effective block or obstruction placed under the wheels of said automobile to prevent it from suddenly starting down the steep incline of said driveway.

"That on or about May 6, 1932, the deceased Sylvia Joy Eberling, being a young child of very tender years, was on the premises of the defendant, playing with the defendant's children, at the invitation and with the permission of the defendant and his wife. That the defendant drove his said automobile into his said driveway, brought it to a stop near the rear of his residence and on the slanting portion of said driveway. That the defendant pulled up and applied the hand brake or emergency brake of his said automobile, and without taking any other or further precaution to block or hold said automobile in its parked position, left the same unattended. That the said emergency brake or hand brake on defendant's said automobile was in a dangerous and defective con-

dition, in that the portions of said brake which were designed to hold and maintain the said brake in its applied condition were defective, which defect was well known by the defendant, or in the exercise of ordinary care should have been known, to him especially when leaving his said automobile in that position on the driveway, and well knowing that the plaintiff's child and other children of tender years were on the premises.

"That the defendant, thus leaving his automobile unattended then went about other affairs about his yard, such as trimming grass and tending flowers, and thus while going about his premises did actually see the plaintiff's deceased child and other children playing around and about his said automobile, but took no further precautions to remedy the unsafe condition in which he had left his automobile, and gave no warning to the plaintiff's deceased child, or to its parents or anyone else, of the dangerous situation which he had created by the parking of his automobile in the manner and under the circumstances aforesaid.

"That on previous occasions the defendant had not left said automobile unattended standing on the driveway as hereinbefore stated, but had previously either placed his automobile within his garage where the floor was level, or had driven it to a point in the rear of his residence where the ground was level and where said automobile was in a safe position. The plaintiff and his wife, mother and father of the deceased, in permitting their child to go on the premises of the defendant, relied upon and expected the defendant to refrain from placing his said automobile in a dangerous position, and expected him to either place his automobile in the garage or on the level place at the rear of the residence, as had been the defendant's custom and habit theretofore.

"That while the plaintiff's child, Sylvia Joy Eberling, was playing with other children around and about the defendant's said automobile, while it was parked as aforesaid on defendant's driveway, the deceased child and probably other children climbed upon a trunk attached to the rear portion of said automobile. As a direct and proximate result of the said automobile being left unattended on the steep driveway, with only a defective hand brake applied, it started off down the steep driveway toward Bellwood Avenue. Thereupon, the deceased attempted to get off the trunk and off the rear part of the car when it began to move. As she was getting off of the car she was thrown to the ground and caught under the rear wheel of the car as it moved down the grade, the rear wheel of said automobile crushing and mangling her body and inflicting internal injuries, from which injuries she died within a few hours.

"That as a direct and proximate result of the defendant's negligence, as aforesaid, the deceased suffered the most excruciating pain

8

from the time of the injuries until the time of her death. That she was immediately taken to the hospital where everything possible was done to relieve her suffering and save her life, but all of which was unavailing.

"The defendant, though liable, refused to pay; therefore the plaintiff sues and demands a jury to try this cause."

The plaintiff reaffirmed and adopted the first eight paragraphs of the first count of the declaration as a part of the second count, and the remainder of the second count is as follows:

"That while the plaintiff's child, Sylvia Joy Eberling, was playing with other children around and about the defendant's said automobile, while it was parked as aforesaid on defendant's driveway, the deceased child and one of the defendant's children climbed upon a trunk attached to the rear portion of said automobile. That another child, or other children were playing around, about and inside of said automobile, while it was on the defendant's steep driveway with only said defective hand brake applied, and that at that time the defendant Garis was out in his yard and within sight of the said children and well knew that said children were thus playing around, about and inside his automobile where he had left it on said steep driveway with only the defective hand brake applied, and well knew or by the exercise of ordinary care should have known that said defective hand brake would be released and said automobile would move down said steep driveway by reason of said children playing around, about and inside of his said automobile under the circumstances.

"That while the deceased Sylvia Joy Eberling was on the trunk on the rear end of said automobile, said defective hand brake was released and said automobile did start down said steep driveway by reason of said children playing around, about and inside of said automobile while it was standing in said dangerous and precarious position where it had been left by the defendant. That said automobile moving down said steep driveway was the direct and proximate result of the said automobile being left unattended on the steep driveway, with only a defective hand brake applied and with children playing around, about and inside of said automobile as aforesaid.

"When said automobile began to move down said steep driveway the deceased attempted to get off the trunk and off the rear part of said car, and as she was attempting to get off she was thrown to the ground and caught under the rear wheel of the said car as it moved backward down the grade, the rear wheel of said automobile crushing and mangling her body and inflicting internal injuries, from which injuries she died within a few hours.

"That as a direct and proximate result of defendant's negligence, as aforesaid, the deceased suffered the most excruciating pain from

the time of the injuries until the time of her death. That she was immediately taken to the hospital where everything possible was done to relieve her suffering and save her life, but all of which was unavailing.

"The defendant, though liable, refused to pay; therefore, the plaintiff sues and demands a jury to try this cause."

The defendant interposed a plea of not guilty, and upon the issues thus made the case was tried below with the result before stated.

On May 6, 1932, and for some time theretofore, plaintiff and defendant were next-door neighbors on the southern side of Bellwood avenue, or Bellwood drive, in the suburbs of the city of Nashville.

Plaintiff was an instructor at Vanderbilt University. His family consisted of his wife and four children. The children ranged in age from four to ten years and included the deceased, Sylvia Joy, a little girl five and one-half years of age.

Defendant was likewise an instructor at Vanderbilt University, and his family consisted of his wife and two children—a boy eight, and a girl five and one-half, years of age. The relative location of the homes of plaintiff and defendant, and the topography of their premises and the surroundings, are stated with substantial accuracy in the declaration, heretofore quoted.

The plaintiff's home was not located "within the city limits of Nashville, Tennessee," as averred in the declaration, but the homes of plaintiff and defendant were "just outside the city limits." However, this is immaterial.

The residences of plaintiff and defendant were separated by an unfenced vacant lot, one hundred and twenty feet wide and beautifully shaded, which was maintained by plaintiff and defendant as a common playground for the children of both families, and was constantly used as such, in connection with the residence lots of both plaintiff and defendant. There was a concrete wading pool on plaintiff's lot at the rear of his residence, and in defendant's "back yard" there was a swing and a sand pile.

The children of plaintiff and defendant, with the knowledge and approval of their respective parents, played together practically every day on the premises of either plaintiff or defendant, or the intervening playground, indiscriminately, as their inclinations led them.

About 3 o'clock in the afternoon of May 6, 1932, defendant Garis drove to his home and up the driveway and parked his car (a four-door Studebaker sedan, with a small trunk on the rear) at the terminus of the driveway, immediately in front of, and about two feet from, the entrance to his garage. He pulled back the hand brake to a point where it held the car stationary and left the doors unlocked and the two front windows open.

Defendant had been driving the car in question for about two years. The hand brake would hold the car when applied and held in place, but the mechanism for holding it in place was defective, in that, the teeth of the pawl and the ratchet did not mesh properly, and as a consequence, a light stroke or jar would release the brake and leave the car free to roll away if on sloping ground and not otherwise hindered.

After parking his car as before stated, defendant spent the remainder of the afternoon, until shortly before 6 o'clock, working with his wife in their flower garden, about thirty feet from the parked automobile and in full view of it.

The plaintiff's children and defendant's little daughter, Nancy Sue, about five and one-half years of age, spent the afternoon before 5 o'clock playing in and around the wading pool at plaintiff's home. About 5 o'clock Nancy Sue Garis went to her home, and after the Eberling children, Sylvia and David, had been bathed and dressed, they went over to the Garis home and remained there—probably for twenty or thirty minutes—until the accident occurred, as a result of which Sylvia Eberling lost her life.

At some time during this period defendant saw two of the children sitting on the running board of his car, and later he saw his little daughter Nancy Sue and Sylvia Eberling sitting on the trunk at the rear of the car. In his testimony at the trial defendant stated that "they were singing." Plaintiff, Eberling, testified that after the accident, and on the same night, defendant said that "he saw the two children on the back of the trunk, singing and playing and kicking their heels against the trunk, with their faces looking down the driveway."

Defendant testified that when he saw the two children on the trunk, as stated, the car had not moved, but that an instant later it was in motion. Defendant ran around to the rear of the car and placed his back against it just at the moment when the right rear wheel rolled against the body of Sylvia Eberling, who, attempting to leap from the trunk, had fallen in the path of the wheel.

In the meantime Mrs. Eberling had heard the alarm and reached the scene, and she and defendant Garis removed Sylvia from beneath the wheel and handed her to a maid who was endeavoring to assist them, and defendant continued his efforts to stop the car, which had again begun to roll as soon as Sylvia's body was removed, but finding his efforts unavailing, he appealed to Mrs. Eberling for assistance.

Mrs. Eberling tried the front doors and found them "either stuck or locked;" but she entered the car through the left rear door, reached over the front seat and pulled back the hand brake, and stopped the car opposite the side entrance to the front of the Garis residence.

As Mrs. Eberling opened the left rear door, she did not see any one in the car, but she testifies that she had "a faint impression of a little form moving out of the back seat, right out the door, not standing up, but just sliding out the door." Mr. Carpenter, a neighbor, who lived on the opposite side of Bellwood drive, heard the alarm and hurried up the Garis driveway. Mr. Carpenter testified that as he approached the Garis car the right rear door was open and he saw little David Eberling (then about four years of age) on the running board, apparently in the act of getting out of the car through the right rear door.

The main point of controversy between counsel in this case is whether Sylvia Joy Eberling was an invitee, or merely a licensee, on defendant's premises at the time she suffered the injuries which caused her death.

It is insisted for plaintiff that his decedent was an invitee, and that the defendant owed her the duty of exercising ordinary care and prudence to see that his premises were reasonably safe for a child of such tender years.

On the other hand, it is contended for defendant that plaintiff's decedent was a mere licensee, and that the only duty which defendant owed to her was to refrain from willfully and wantonly maintaining on his premises any "trap" or condition which would endanger her.

The determination of the controversy above stated, and a collateral question hereinafter mentioned, will dispose of the defendant's first and fourth assignments of error, through which it is asserted that there is no evidence to support the verdict, and that the trial judge should have sustained the defendant's motion for a directed verdict in his behalf; and also the fifth assignment, that the trial court erred in charging the jury as follows:

"This case is based on the alleged negligence of the defendant, and the defendant, among other things, contends that the plaintiff was guilty of negligence which approximately caused or contributed to said child's injury and death by permitting it to play on defendant's premises around, about and on said automobile. Negligence, as applied to either the plaintiff or to the defendant, in a case like this means the failure to exercise ordinary care, that is, such care as ordinarily prudent persons would exercise under circumstances similar to those shown by the evidence in this case."

We think it obvious that the arrangement between plaintiff and defendant and their families, whereby they maintained their respective premises and the intervening lot as a playground for the use of the children of both families, was a matter of common interest and mutual advantage.

"An invitation may be inferred when there is a common interest or mutual advantage, a license when the object is the mere pleasure

or benefit of the person using it. . . . There must be some mutuality of interest in the subject to which the visitor's business relates, although the particular business which is the object of the visit may not be for the benefit of the occupant." 3 Cooley on Torts (4 Ed.), sec. 440, pp. 193, 194.

"It is the universal rule that persons entering voluntarily upon the premises of another, out of idle curiosity or for their own pleasure or advantage, take the same as they find them, and the owner or occupier thereof is bound only to avoid wanton or willful injury to them; but if the purpose of going upon the premises is the common interest, or for the mutual advantage of the parties, an implied invitation which makes it the duty of the owner or occupier to maintain the same in a reasonably safe condition may be inferred." Printy v. Reimbold, 200 Iowa, 541, 202 N. W., 122, 124, 205 N. W., 211, 41 A. L. R., 1423, 1427.

The authority upon which the learned counsel for defendant seem to chiefly rely is the Wisconsin case of Greenfield v. Miller, 173 Wis., 184, 180 N. W., 834, 12 A. L. R., 982, wherein it was held that a guest, invited to come into the premises of the host for social or benevolent purposes, is a licensee, and the rule of ordinary care does not apply. It was there held that the host is not liable for injury to the guest who falls upon an unfastened rug laid upon a waxed floor.

With reference to the case just mentioned, it is sufficient for present purposes to say that in the midst of the opinion the court expressly recognizes the rule that, where the visitor comes "for a purpose connected with the business in which the occupant is engaged, or which he permits to be carried on there," or where there is "some mutuality of interest in the subject to which the visitor's business relates, although the particular thing which is the object of the visit may not be for the benefit of the occupant," an invitation is implied, and the rule of ordinary care prevails.

██ "An invitation is implied when the owner, by acts or conduct, leads another to the belief that the use is in accordance with the design for which the place was adapted and allowed to be used in mutuality of interest." Robinson v. Leighton, 122 Me., 309, 119 A., 809, 810, 30 A. L. R., 1386, 1389.

"The owner who expressly or by implication invites or induces others to come upon his premises, whether for business or other purposes, owes to them the duty of being reasonably sure he is not inviting them into danger, and must exercise ordinary care and prudence to render the premises reasonably safe." Leonard v. Enterprise Realty Co., 187 Ky., 578, 219 S. W., 1066, 1068, 10 A. L. R., 238, 242; 3 Cooley on Torts (4 Ed.), sec. 440.

"The authorities are entirely agreed upon the proposition that an owner or occupant of lands or buildings, who directly or by im-

plication invites or induces others to come thereon or therein, owes to such persons a duty to have his premises in a reasonably safe condition, and to give warning of latent or concealed perils." 20 R. C. L., p. 55, par. 51.

Where the invitee is a child of tender age, the invitor is held to a knowledge that such child will ordinarily indulge the natural instincts of a child and amuse himself or herself with whatever may be in sight.

"Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them, must calculate upon this, and take precaution accordingly." Townsley v. Yellow Cab Co., 145 Tenn., 91, 94, 237 S. W., 58; Carney v. Cook, 158 Tenn., 333, 336, 13 S. W. (2d), 322.

"Where the owner permits his premises to be used by children as a playground, not intermittently or occasionally, but to such an extent as to cause the place to be generally known in the immediate vicinity as a place of recreation, he must use ordinary care to keep the premises in a safe condition." Cooley on Torts (4 Ed.), sec. 441, p. 205.

"The rule requiring the owner or person in charge of property to keep it safe for invitees, applies of course, to infant invitees; and, as the characteristics of children are proper matters for consideration in determining what is ordinary care with respect to them, there may be a duty to take precautions with respect to children of tender years which would not be necessary in the case of adults or children who have reached an age when they are able to understand, appreciate, and avoid danger." 45 C. J., p. 838, sec. 248.

"This doctrine is but one phase of the wider doctrine that an owner must keep his premises reasonably safe for the use of people whom he invites to come on them—an application of the general doctrine with special reference to the nature of children, and in accordance with the principle that what constitutes due care in a given instance depends on the degree of danger to be apprehended." Hillerbrand v. May Mercantile Co., 141 Mo. App., 122, 121 S. W., 326, 328.

Children are more heedless and have less discretion and capacity to avoid danger than adults. More care must be exercised by others for their safety. One using dangerous instruments, machinery, or vehicles, when he knows children are in close proximity, is required to use a degree of caution not required of him in the case of mature persons. Id., p. 328.

An automobile is not inherently a dangerous machine, and the rules requiring extraordinary care of dangerous instrumentalities do not apply to it. 2 R. C. L., p. 1190, par. 24; Leach v. Asman,

130 Tenn., 510, 513, 172 S. W., 303; Taylor v. Arnold, 2 Tenn. App., 246, 251; Goodman v. Wilson, 129 Tenn., 464, 166 S. W., 752, 51 L. R. A. (N. S.), 1116.

And the theory that an automobile is an "attractive nuisance" has not met with favor by the courts. 2 Blashfield's Cyc. of Automobile Law, p. 1077; Campbell v. Model Steam Laundry, 190 N. C., 649, 654, 130 S. E., 638.

Although an automobile may not, in law, be classed as an "inherently dangerous machine" or an "attractive nuisance," yet when it is so left exposed that children of tender years are likely to come into contact with it under circumstances obviously dangerous to them, the persons who thus expose the automobile should in reason anticipate the injury that is likely to result to such children, and exercise reasonable care to prevent it. Campbell v. Model Steam Laundry, supra.

It is insisted for defendant Garis that if it be found that he was negligent in leaving his car on the inclined driveway, held only by the defective hand brake, nevertheless such negligence of defendant was not the proximate cause of the death of plaintiff's intestate; that the brake was released by little David Eberling, which caused the car to roll downhill; and that this was an independent, intervening cause, and the proximate cause, for which defendant was not responsible.

It may or may not be true that little David Eberling released the brake. That he did so is merely an inference from the fact that he was seen to emerge from the right rear door of the car as it was rolling down the driveway. There is no proof that he had been in the front of the car where he could touch the brake. Whether he released the brake, or the jarring and jostling of the car by the two little girls seated on the trunk caused the brake to turn loose, is a question that is not answered by the evidence.

However, the jury could reasonably infer from all the facts and circumstances in evidence, that the brake was released by one or the other of the means above suggested, and in either event could find that the negligent act of the defendant in parking his car, with the defective hand brake in the manner and under the circumstances alleged in the declaration and shown in the proof, was the proximate cause of the injuries and death of the plaintiff's decedent.

"It is universally agreed that the mere fact that the intervention of a responsible human being can be traced between the defendant's wrongful act and the injury complained of will not absolve him. On the contrary, the general rule is that whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary course of events, though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrong-

doer, or was in reality only a condition on or through which the negligent act operated to produce the injurious result. Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequence; and if they are such as might, with reasonable diligence, have been foreseen, the last result, as well as the first, and every intermediate result, is to be considered in law as the proximate result of the first wrongful cause. The question always is, Was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise." 22 R. C. L., pp. 134, 135, par. 19.

"What is meant by 'proximate cause,' is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Closeness in causal relation, rather, is the meaning." Grigsby & Co. v. Bratton, 128 Tenn., 597, 603, 163 S. W., 804, 806.

It has been held in a line of cases (on which defendant relies) that one may leave an automobile standing unattended in a public street temporarily, without being guilty of negligence, provided he takes the ordinary precautions of securing it by the appliances with which it is equipped for that purpose; and that if it is thereafter set in motion by the willful or negligent act of a third person, such willful or negligent act will be deemed the proximate cause of the injury resulting therefrom, and the owner will not be liable. See Jackson v. Mills Baking Co., 221 Mich., 64, 190 N. W., 740, 741, 26 A. L. R., 906; Rhad v. Duquesne Light Co., 255 Pa., 409, 100 A., 262, L. R. A., 1917D, 864; Sorrusca v. Hobson (Sup.), 155 N. Y. S., 364; Frashella v. Taylor (Sup.), 157 N. Y. S., 881; Berman v. Schultz, 40 Misc., 212, 81 N. Y. S., 647 (second appeal [Sup.], 84 N. Y. S., 292); Maloney v. Kaplan, 233 N. Y., 426, 135 N. E., 838, 839, 26 A. L. R., 909; and other cases in accord, digested in Annotation appended to the last-cited case, supra.

We do not think the cases just cited are precisely analogous to the instant case. The point of differentiation is indicated in some of the opinions. For example: In Jackson v. Mills Baking Co., supra, the court said:

"If Brewin (defendant's driver) had left his wagon (an electric motor vehicle) standing in the street and gone out of sight of it, and remained away for a considerable period while children were in the habit of playing in and around it, a different question would be presented."

And in Maloney v. Kaplan, supra, it is said:

"The duty of the driver of such a vehicle (a motor vehicle), when he leaves it unattended in the street, is to be careful to have it so secured that it will not start up, except by the intervention of some external cause *not to be anticipated or guarded against.* . . . The driver of a motor vehicle who has set his brake, turned off his engine, and turned the front wheels to the curb, or otherwise stopped it securely in the circumstances, is not chargeable with the act of boys or others who willfully start the car and thereby cause injury, *at least when the circumstances are not such as to suggest unusual care to guard against probable interference with the car.*" (The italics are ours.)

In the instant case, the defendant knew that the children were playing around and on his car, and he knew that nothing was holding the car in place but the precarious tenure of the defective brake. The jury might well have found that in the circumstances disclosed by the record an ordinarily prudent person would have anticipated that the brake might be released and the car roll backwards down the driveway, and that such an occurrence would endanger the lives of the children.

"Acts that might be considered prudent in one case, may be deemed to be negligent in another." 20 R. C. L., p. 11, par. 7.

In the case of Campbell v. Model Steam Laundry, 190 N. C., 649, 130 S. E., 638, supra, it was held that an electric delivery truck was not an "attractive nuisance," but that a recovery may be had when it is negligently left on a city street, ready to start, and a child of tender years sets it going and its death is thereby caused, under circumstances from which the result should have reasonably been anticipated in the exercise of ordinary care.

In the New York case of Lee v. Van Buren & New York Bill Posting Co., 190 App. Div., 742, 180 N. Y. S., 295, it was held that in an action for the death of a child crushed by the starting of defendant's truck by another child, where defendant knew that children played around its automobiles and that the brakes were defective, and that the switch was not thrown off, it was a question for the jury whether defendant was guilty of negligence proximately causing such death.

The case of Connell v. Berland, 223 App. Div., 234, 228 N. Y. S., 20, was an action for damages for personal injuries. The defendant parked his automobile in a congested locality where he knew children were constantly playing in the street, and left his car, which was equipped with a self-starter, with the doors unlocked and with the ignition key in the switch, in which condition the car was started by a boy and ran over the curb and injured the plaintiff. It was held that the question of defendant's negligence was for the jury.

In Gumbrell v. Clausen-Flanagan Brewery, 199 App. Div., 778,

192 N. Y. S., 451, it was held that evidence that defendant's servant left an electric truck standing in a street where there were numerous children, knowing that they had been accustomed to play in trucks left in the street, and that the truck was started by one child who climbed into the seat and pulled a lever, so that it may be inferred the defendant did not remove the switch key, which would have rendered starting of the truck impossible, was sufficient to warrant the jury in inferring negligence on the part of defendant's servant as to a child run over by the truck when so started, and required the submission of the question of negligence to the jury.

In the Missouri case of Vaughn v. Meier (Mo. Sup.), 246 S. W., 279, it was held that the fact that a car, which was parked by its owner on a steep grade, was subsequently started in motion by the vibration caused by a passing fire truck, is sufficient to show negligence in parking of the car, since the owner should have reasonably anticipated the passing of heavy vehicles, even though the car remained stationary for three quarters of an hour before it started, especially where there was evidence it was negligence for him not to turn the wheels toward the curb.

In Oberg v. Berg, 90 Wash., 435, 156 P., 391, it was held a question for the jury whether or not the defendant was negligent in parking his car, and whether such negligence was the proximate cause of its starting and injuring the plaintiff, where it was plain from the evidence that if the machine had been properly secured it would not have started by the force of gravity alone, and the evidence was conflicting upon the question as to whether any one meddled with the car before it started, and whether that was the cause of its starting.

See, also, 1 Berry on Automobiles (6 Ed.), section 529, on the subject of "Child Starting Unattended Truck."

Upon the evidence in the present case, it was for the jury to ascertain the proximate cause of the injuries and death of plaintiff's intestate. Elmore v. Thompson, 14 Tenn. App., 78, 101, and authorities there cited.

There is, in our opinion, evidence to sustain the jury's finding of the issues against the defendant, and the trial judge did not err in overruling defendant's motion for a directed verdict.

We are also of the opinion that the deceased was an invitee on the premises of the defendant and the defendant owed her the duty of exercising ordinary care for her safety, and the trial judge did not err in so instructing the jury. The first, fourth, and fifth assignments of error are overruled.

The sixth assignment is that the trial court erred in charging the jury as follows:

"The Court further instructs you, Gentlemen, that if you shall find from a preponderance of all the evidence in the case that the

defendant parked his automobile on his slanting or inclined driveway with the intention of leaving it unattended while small children were known by him to be playing around and about it, and especially if the doors were left unlocked so they could get into the car, then it was the defendant's duty to set up his hand brake securely and to do everything else that he could do, by the exercise of ordinary care, to keep the car from rolling down hill. It was also the defendant's duty to see to it and know that this hand brake was in good repair at the time he left the car unattended under such circumstances, if he could have known or ascertained the condition of said hand brake by the exercise of ordinary care, and if you shall find from a preponderance of all the evidence in the case that the defendant failed to perform his duty, as above set out, and that such failure was the sole, proximate cause of the accident, then the defendant would be liable in this case and your verdict should be in favor of the plaintiff.''

In addition to the claim that it was error to require of defendant the exercise of ''ordinary care'' (which we ruled otherwise in disposing of the fifth assignment of error, supra), defendant's counsel interpret the last above-quoted charge as an instruction, ''telling the jury that it would be an act of negligence to leave the doors of the automobile unlocked so that children could get into the car.'' This is, we think, a mistaken interpretation of the charge. The court did not tell the jury that it was the defendant's duty to lock the doors of the car, or that it would be an act of negligence for defendant to leave the car doors unlocked, but the court stated, in substance, that if the car doors were left unlocked while small children were playing around and about the car, and this was known to the defendant, then it was defendant's duty to set up his hand brake securely, and do everything else that he could do by the exercise of ordinary care, to keep the car from rolling down the hill, and that a failure to perform that duty would be negligence, etc., The sixth assignment of error is overruled.

The seventh assignment is that the trial court erred in charging the jury as follows:

''Gentlemen, the Court further instructs you, that if you shall find from a preponderance of all the evidence in the case that the hand brake on defendant's car was set up by the defendant under the circumstances heretofore set forth in this charge and that while said hand brake was sufficient to hold the car from running backward down that driveway at the time the brake was set up but that the pawl or safeguard that was intended to fit into the teeth or notches of the brake ratchet, or if such teeth or notches themselves were so worn or defective that slight pressure such as a child coming in contact with the brake lever was sufficient to release the car and cause it to run backward down that incline driveway, and

if you shall further find that the defendant had knowledge of such defective condition, or that he could have had such knowledge by the exercise of ordinary care, and if you further find that said defect constituted the sole, proximate cause of the injury complained of, then the defendant would be liable in this case.''

The defendant's criticism of this instruction is that it embraces the theory that defendant's negligence could be the proximate cause of the injury complained of, even though little David Eberling released the brake lever and thus caused the car to roll down the hill. We have heretofore ruled adversely to defendant's contention on this point in disposing of the first and fourth assignments of error. The seventh assignment is overruled.

The eighth assignment is that the trial court erred in charging the jury as follows:

''On the other hand, Gentlemen, it was the duty of the plaintiff, who was the father of the little child, to observe ordinary care for the safety of said child, as the law does not require little children five or six years of age to know anything about automobile machinery, nor does the law require of such children any care on their part for their own safety in a case like this, but the law did require the father who had the custody of the little daughter, Sylvia Joy Eberling, to exercise ordinary care for her safety.''

It is said for defendant that this was equivalent to an instruction that the deceased could not be held guilty of contributory negligence in this case; and that such instruction was contrary to the rule announced in Wells v. McNutt, 136 Tenn., 274, 189 S. W., 365.

In Wells v. McNutt, supra, the trial judge charged the jury in substance that it was for the jury to determine whether plaintiff Willie Wells, a child six years of age, by reason of her tender age, was incapable of exercising any degree of care, and that she was required by the law to exercise only the degree of care which an ordinarily prudent child of her age might have been expected to use under the circumstances.

Plaintiff requested the trial judge to charge the jury as follows: ''I charge you that Willie Wells, being but six years of age at the time she was injured, on account of her tender years and because she had not reached the age of discretion, cannot be chargeable with contributory negligence.'' But this request was refused. There was a verdict for the defendant, and the plaintiff appealed and assigned the refusal of the aforesaid request as error. The Court of Civil Appeals held that there was no error in the rulings of the trial court, and on petition for certiorari, the Supreme Court held that: ''The true rule in civil actions is that there is a presumption, non-conclusive and rebuttable in character, that a child under seven years of age is not guilty of contributory negligence, for lack of capacity.''

After thus stating the rule, the court continued, in its opinion, as follows:

"Convenient, because definite, as would be the rule fixing that period for the application of a conclusive presumption, it is apparent that it would not operate justly in all civil cases. There should not be fixed arbitrarily any age when an infant is presumed, as a matter of law, to be capable of exercising discretion and care. Some children mature earlier than others; some have natural capacity or better training in habits of thought than others who are older. Moreover, care or lack of care is a thing related to the particular surroundings, simple or complex, of the accident under investigation. It is also easily conceivable that a child nearly seven years of age by reason of living near the scene of the injuries may be better acquainted with and appreciative of the dangers incident to it than some other child of fifteen unacquainted with it.

"Prima facie a child of six is not guilty of contributory negligence, but the defendant is not precluded from insisting that, under the facts disclosed in the particular case, the infant had capacity to be and was negligent. The capacity of the infant is, then, one of fact for the jury to pass upon, and not one of law for the court. The trial judge therefore did not err in refusing the request tendered. (Citing cases.)

"To charge as requested in relation to a child three or four years of age (Bamberger v. Citizens' St. L. R. Co., 95 Tenn., 18, 31 S. W., 163, 28 L. R. A.; 486, 49 Am. St. Rep., 909), or in a case where no facts were developed to overcome the prima facie case, might not be reversible error. A number of the cases cited in support of the doctrine of conclusive presumption as a matter of law merely so hold.

"Sufficient facts appeared in the pending case to take to the jury the determination of the question of fact of the capacity of plaintiff.

"The judgment of the Court of Civil Appeals holding that of the circuit court to be correct is affirmed."

Applying the rule stated in Wells v. McNutt to the instant case: There was a presumption that, by reason of her tender age, the deceased was not guilty of contributory negligence, and if "no facts were developed to overcome the prima facie case," the charge of the trial court challenged by the eighth assignment was not reversible error.

A careful scrutiny of the record has satisfied us that there is no evidence upon which the jury could have reasonably based a finding that the deceased child was guilty of negligence which contributed to her injuries and death. The evidence relating to the conduct of the deceased is undisputed, and we are of the opinion that no reasonable man would find that a child five and

one-half years of age, although unusually intelligent for one of her years, and having the mind of a child seven or eight years of age, would ordinarily anticipate the danger and appreciate the peril of sitting on the trunk of an automobile under the circumstances surrounding the accident involved in this case.

Certainly the deceased was not chargeable with negligence because she attempted to get off the automobile when she discovered that it was rolling down the driveway. An adult would have been excusable for similar conduct in such an emergency. 20 R. C. L., p. 29, par. 22.

 We entertain no doubt that the result would have been the same if the trial court had instructed the jury to find whether or not the deceased was guilty of negligence which proximately caused or contributed to her injuries and death; and we are forbidden by statute to set aside a verdict or judgment, or grant a new trial, on the ground of error in the charge of the judge to the jury, unless after an examination of the entire record we are of the opinion that the error complained of has affirmatively affected the result of the trial. Code of 1932, sec. 10654; Carney v. Cook, 158 Tenn., 333, 339, 13 S. W. (2d), 322; Dale v. Continental Insurance Co., 95 Tenn., 38, 52, 31 S. W., 266; Oliver v. Nashville, 106 Tenn., 273, 281, 61 S. W., 89; Lowry v. Railroad Co., 117 Tenn., 507, 514, 101 S. W., 1157, 6 L. R. A. (N. S.), 887, 119 Am. St. Rep., 994. The eighth assignment of error is overruled.

 The ninth assignment is that the trial court erred in refusing to grant defendant's request No. 1 to charge the jury, as follows:

"Gentlemen of the Jury, I charge you that if you believe the defendant in stopping his car on his driveway pulled back the emergency or hand brake to a sufficient extent to keep the car from rolling back and that it would not have rolled back had the brake not been loosened by the little Eberling boy, and that the defendant did not know he was in the car or by the exercise of reasonable care should not have known he was in the car, then I charge you there would be no liability on the part of the defendant and you should render a verdict for him."

The instruction thus requested assumes as a fact that the little Eberling boy released the brake and therefore, if given, would have invaded the province of the jury, for, as before stated, there is no direct and definite proof of the means by which the brake was released. This depended upon inferences, which the jury and the jury alone had a right to draw from the facts and circumstances in evidence.

Moreover, the effect of this requested instruction, if given, would have been to charge the jury that if the little Eberling boy loosened the brake, the defendant would not be liable for the consequences,

unless he knew that the little Eberling boy was "in the car," or by the exercise of reasonable care should have known that he was "in the car."

There was no semblance of proof that defendant knew that the little Eberling boy was "in the car," and such instruction would have excluded the consideration of all evidence of antecedent negligence of defendant in failing to have his premises in a reasonably safe condition for the children invited there to play; and would have amounted to a direction of a verdict for the defendant in the event the jury should find that the little Eberling boy released the brake. The ninth assignment of error is overruled.

The tenth assignment is that the trial court erred in refusing to grant defendant's request No. 2 to charge the jury, as follows:

"Gentlemen of the Jury, an automobile in and of itself is not a dangerous instrumentality. It is not an attractive nuisance, that is, it is not an object so attractive to children as to require the owner thereof to exercise a greater degree of care with reference to the use and maintenance thereof than would be required of him in the use and maintenance of any other personal property he might have which is not of a dangerous nature.

"Therefore, unless you believe from a preponderance of the proof in this case that the defendant knew or ought to have known that little David Eberling was on the inside of his car before this accident occurred, and that he knew, or in the exercise of ordinary care, should have known that by being in the car he was liable to release the brake, your verdict must be for the defendant."

It is seen that this requested instruction contains the same vice as defendant's request No. 1, which we have heretofore held, in disposing of the ninth assignment of error, was properly refused.

The tenth assignment is accordingly overruled.

The eleventh assignment is that the trial court erred in refusing to grant defendant's request No. 3 to charge the jury, as follows:

"The defendant had a right to park his car on his driveway at any place he saw fit and it was not incumbent on him to place blocks, rocks or other objects under the wheel or wheels to prevent it from rolling back, if in leaving it parked on an incline he set his brakes, or left it in gear, sufficiently to prevent the car from rolling back without any other outside human interference other than by himself or his servant, agent or employee."

Under defendant's request No. 3, supra, his duty would have been discharged if he set the brake sufficiently to hold the car in place so long as the brake was not released by "outside human interference." It would have been error to so instruct the jury. There was material evidence in the record upon which the jury could find

that it was the duty of the defendant to anticipate the probability that the little children playing around his car might get upon it or in it and either purposely or accidentally release the defective hand brake, and thus start the car down the steep driveway. The eleventh assignment of error is overruled.

██ Through his twelfth assignment the defendant says that, in stating his views with respect to the admissibility of certain testimony, to which objection had been made, the trial judge in effect "told the jury that the defendant had left his car in a dangerous situation," and that this was an invasion of the province of the jury.

The comments of the court upon which the assignment is based, were made in the course of the cross-examination of plaintiff by defendant's attorney, and could not well be understood without reference to the context. An excerpt from the record, including the criticized remarks of the court (italicizing that part upon which error is assigned), is as follows:

"By Mr. Armistead: Q. My question is this: Doctor, as I understood you to say, and I want to get it correctly, if you saw that Dr. Garis parked his car on the driveway and your little child was over there that you not only would go over there and tell your child to come home but you would tell Mr. Garis not to park his car on that driveway? A. That is quite correct.

"Q. Now then, let me ask you this question—what right did you think that you had now when your daughter is at home, we are going to say, after you had gone and got her home, your children over on this side, on your side of the yard, what right, or at least upon what basis do you say that you could tell Dr. Garis not to park his car in the driveway? A. Well, I don't know what legal right but I think, Mr. Armistead, that I have a right to assume that Mr. Garis would use ordinary precaution at least.

"Q. Now then, I will ask you this question. Dr. Garis had children of his own. That is correct, is it? A. He has.

"Q. And one of his children is just about the same age as your precious little daughter who passed away? A. That is right.

"Q. Now then, do you say that you are in a better position to judge for the care of your children than Dr. Garis is in a position to judge for the care of his children?

"By Mr. White: Now, if your Honor please, that is certainly incompetent. It is not a question of whether he is in a better position. If he didn't use proper judgment and ordinary care it makes no difference what kind of position he is in. It is just leading on to argument.

"By the Court: *Now, gentlemen, here is the way to rule on this, I think. It ought to be satisfactory to both sides. It wasn't so much, if Mr. Eberling's child was at home and not over there—it wasn't so much a matter of his having 'a right to go over there and warn*

*Mr. Garis, but whenever any citizen sees his neighbor or any other citizen doing a negligent thing that is liable to result in a catastrophe it is the duty of every man that he owes|to 'society to give notice of that fact. It is not a question of the right. It is a question of an obligation |to society in general. You see a man being careless in doing a thing—warn him of it. You may prevent a tragedy. The man may resent the warning. I am not saying that Mr. Garis would at all, but you may warn a neighbor or any other human being against some dangerous thing or situation. You may not have any right to do it and the man may resent it—why, you keep off of my 'place; you have no business over here; that is my business. That is all right.⋅ He has got the right to say that, but every man owes it to society to give notice to another man that is doing a thing that is likely to result in damage. It is not a question of legal right. There are some laws that rise higher than statutes—the duty that one man owes to his fellow man. So I think that his testimony is competent, whether he had a right to do it or not, that is, the legal right to do it or not. He had a right to warn him.*

"By Mr. Armistead: My question was, may it please the Court, as I understand this witness to testify that a person can't, in the exercise of ordinary care, or wouldn't leave his car parked as the defendant left the car parked this time. I understood him to voluntarily say that awhile ago. Now, my question that I had asked, to which Mr. White objected, was this; does he think that he was in any better position to pass upon whether a man is in the exercise of ordinary care to have a car parked that way than the defendant was. That is my question.

"By Mr. White: My only purpose in objecting was to keep out stuff that is immaterial. I will withdraw the objection. We will get along faster. Now, if you want to go into it it will be perfectly all right with me.

"By the Court: I don't think though that he was in a better position or worse position. If he was in a position at all to realize the danger. I think it was his duty to say something about it.

"By Mr. Armistead: I thoroughly agree with you too. If I see a neighbor of mine that has got something that is dangerous on his place I am going to tell him about it. If I see your Honor is maintaining something dangerous—

"By the Court: If I was to point a pistol at somebody it would be your duty to come and say, you ought not to point that pistol at that fellow;⋅it may be loaded. You are not in as good a position to know about that as I am. I know it is not loaded; I just took it out, but you don't know and you come and give me that warning.

"By Mr. Armistead: If I were to see your Honor in that position I would just go to a telephone and send someone up there. I wouldn't go up there.

"By the Court: And by the time you go to the telephone it may be that John Jones was dead.

"By Mr. White: It would depend a great deal on whether it had a hair trigger on it."

The plaintiff had testified in substance that he had never seen defendant's car parked on the inclined driveway; that defendant's custom was to park his car either in his garage, or on a level space behind his residence; and that he (plaintiff) regarded it as dangerous to park a car on the driveway. The remarks of the court manifestly had reference to the right of the witness (the plaintiff) to warn his neighbor if and when he saw what he conceived to be a dangerous situation upon his neighbor's premises. Presumably this testimony of the plaintiff had a bearing upon the issue as to whether he had been guilty of contributory negligence.

It is, we think, apparent that the trial judge did not intend to say, and did not say, that defendant had parked his car in a dangerous situation, and we do not think that the jury could have so understood him. In his charge the court submitted this question to the jury for its determination without an intimation of the court's opinion as to whether the defendant had or not parked his car in a dangerous situation. The twelfth assignment of error is overruled.

 Although not included in the formal assignments of error, it is said in the brief for defendant that the trial court *was not satisfied with the verdict,* and that therefore a new trial should be granted.

"The rule in civil cases is that, if the circuit judge is dissatisfied with the verdict of the jury, it is his duty to set it aside and grant a new trial, and that upon its being made to appear to this court, from statements made by the circuit judge in passing upon the motion for new trial, that he was really not satisfied with the verdict, it becomes the duty of this court, when it has acquired jurisdiction of the cause, to do what the circuit judge should have done; that is, to grant a new trial on the ground of the dissatisfaction of that judicial officer with the verdict." Telephone & Telegraph Co. v. Smithwick, 112 Tenn., 463, 467, 79 S. W., 803, 804, and cases there cited; Curran v. State, 157 Tenn., 7, 14, 4 S. W. (2d), 957; Nashville, C. & St. L. Railway Co. v. Perry, 13 Tenn. App., 268.

The motion for a new trial below contained the same grounds covered by the assignments of error in this Court, and the further assignment that the evidence preponderated against the verdict. So far as disclosed by the record, all that the trial judge said in disposing of the motion for a new trial was as follows:

"This case was tried by able and competent lawyers and lasted several days. There may be error because I charged the jury that the little Eberling child could not be guilty of any negligence, but I do not think it was affirmative error. If I grant a new trial, I do

not know what the result would be on the second trial. The same verdict might be reached if the case is tried again. It costs money to litigate. It costs the State and County for the judge's salary, the salaries of the Officers of the Court, and the fees of Jurors. Let the motion be overruled."

We find no indication, either in the above quoted remarks of the trial judge or elsewhere in the record, that his honor was dissatisfied with the verdict upon the facts. He conceded that there might be error in his charge to the jury "that the little Eberling child could not be guilty of any negligence," but he did not think that such error was sufficient to justify the grant of a new trial, with its attendant expense and the probability that "the same verdict might be reached if the case is tried again." Carney v. Cook, supra, page 340 of 158 Tenn., 13 S. W. (2d), 322.

There remains for disposition only the second assignment, that "the verdict is excessive," and the third assignment, "that the verdict is so excessive as to indicate prejudice, passion and caprice on the part of the jury."

On defendant's brief it is said that: "A verdict for $10,000 in a case of this nature for the death of a five and one-half year old child is entirely out of line with verdicts commonly rendered by our courts for the death of young children."

As said in Reeves v. Catignani, 157 Tenn., 173, 176, 7 S. W. (2d), 38, 39: "The complaint in the case at bar is not that the verdict was corrupt either actually or inferentially but that it was so large as to indicate that it was influenced by passion, prejudice or caprice; in other words, not that it was a dishonest verdict, but that it was an excessive verdict."

The deceased was a healthy, well-developed child, "rather mature for her years;" that is, she "had the mind or mental capacity of a child seven or eight years old." She had not "started to school," but she had "started to doing such work as drawing, playing the piano, music, and things of that kind." "She had showed considerable talent for a little child in painting and music lessons," and she could also read and write "to some extent."

Upon her removal from beneath the wheel of defendant's car, Sylvia was promptly carried to the Vanderbilt Hospital, where she was attended by some members of the hospital staff and by Dr. W. A. Bryan, whose testimony we quote in part, as follows:

"Q. Did you examine her? A. Well, I would say yes, if you call that—I didn't give her what you would call an exhaustive examination because the child was in no condition to have an exhaustive examination. I examined her sufficiently to make up my mind about her condition.

"Q. You examined her sufficiently to see that she was seriously injured? A. Yes.

"Q. What did you find her condition to be that indicated this serious condition? A. She had an escape of air from the air passages into the check between the lungs.

"Q. Is that what is known in the medical profession as pneumo-thorax? A. It was pneumo-thorax and more than that.

"Q. That was an injury that would necessarily cause her death and there was no relief from it? A. We thought so; yes sir.

"Q. Could you tell from your examination whether she had received this injury as the result of trauma or mashing? A. That was our judgment, yes sir. And that was the history of the case also.

"Q. Could you see bruises and cuts and scratches on her? I am not asking for details. A. I will have to give you my impression about that. My impression is that we did but as a matter of fact, when a patient is suffering from a fatal or near-fatal injury good doctors are not much in the habit of paying attention to bruises and scratches. In other words, the general condition of this patient and the local condition of her chest internally was what concerned us rather than bruises and scratches, and if I had seen them they would have made no particular impression on me.

"Q. Do you recall whether you stayed there until her death? A. I don't recall that I stayed there until the time of her death.

"Q. Then you don't recall whether you know what time she died? A. No sir, I don't.

"Q. From what you saw of her was it your opinion that she would die; that it was a fatal injury? A. Yes sir, she had a hopeless injury.

"Q. Doctor, was there a swelling at the time you saw her as the result of air escaping from her lungs? A. Yes, sir, there was, definitely.

"Q. Was there swelling in her throat? A. All through the throat and chest."

The condition of the deceased during the period of approximately two hours which intervened between the accident and her death is further disclosed by the testimony of her mother, Mrs. Eberling, as follows:

"Q. Did Sylvia Joy swell any? If so, when did that begin? A. That didn't begin until later. She lived very nearly two hours about until a quarter to eight and at the time she was in a state of shock but conscious and we took her upstairs and she was able to speak and she was very thirsty and wanted water and Dr. Bla-lock was afraid to give her much water for fear it might cause a hemorrhage. She was having a very slight cough (indicating by hacking cough), and she wanted water and I kept giving her just little tiny pieces of ice to melt on her tongue so that she couldn't swallow and gulp it and cause her to choke. That was all she had

at the time was that state of shock and the little cough that kept getting worse.

"Q. Well, did you stay there in her room? A. I was with her until about possibly half past seven when Dr. Bryan and Dr. Blalock were working over her with a special nurse and pulmotor or some such thing as that and I had to leave the room then.

"Q. Was that some kind of machine they were using attempting to pump air? A. Yes sir. They had two, one in there and one in the hall. I didn't know which was which, but one was a pulmotor and the other was some kind of oxygen tank, I believe. . . .

"Q. Where was the swelling? A. It was in here. The doctor said—I didn't know what it was—it was air that came in the neck and then it cut off the circulation and caused her death."

With respect to the measure of damages, the trial judge properly charged the jury as follows:

"In assessing damages in a case like this you should take into consideration the nature and extent of the suffering endured by the child before its death on account of the accident, together with the pecuniary value of such a life, based upon the child's age, the condition of its health and its expectancy of life. After weighing all these elements you should assess such damages as would be reasonable and sufficient to compensate for the loss of such a life."

It is obvious that compensation for mental and physical suffering and the value of the life of a little child are not susceptible of mathematical computation, and the law confines the amount of the damages to be assessed in such cases to the judgment of impartial jurors, guided by the facts and circumstances of the particular case; and "next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence." Reeves v. Catignani, supra; Power Packing Co. v. Borum, 8 Tenn. App., 162, 180.

However, it is well established, by a long line of decisions in this and other jurisdictions, that the judgment of the jury and the trial judge, with respect to the amount of the verdict, is subject to review by the appellate courts, and we cannot avoid the duty of giving full consideration to the defendant's insistence that the amount of the verdict in the present case is excessive.

From the standpoint of feeling and sentiment, no sum of money, however large, could compensate the parents of this little child for her loss, but the mental suffering of the parents is not an element of damage for which the law allows compensation in such case.

Neither is there any basis in the instant case for the award of exemplary or punitive damages.

"In many of the states, while there is no limit to the amount of damages recoverable for personal injury, there is a limit in case of death by wrongful act. Thus, in some jurisdictions, the statute

giving a right of action for wrongful death expressly provides that the recovery of damages shall not exceed $5,000, while in others the limit is fixed at $10,000." 8 R. C. L., p. 846, par. 121.

In Tennessee there is no statutory limit to the amount of damages which may be awarded for a wrongful death; but "there must. be, of course, some limit to the amount to be allowed, and it is the plain duty of an appellate court to see that the just limits are not exceeded." 8 R. C. L., p. 849, par. 123; Grant v. Railroad Co., 129 Tenn., 398, 409, 165 S. W., 963.

In ascertaining what are the "just limits" of verdicts in such cases, it is not permissible for the court to merely substitute its judgment for that of the jury in the particular case; but the courts recognize the value of precedents with reference to the true amount of damages to be awarded under similar circumstances, and will consider the amount awarded in other similar cases in determining whether the particular verdict is excessive. 8 R. C. L., p. 678, par. 217; Central of Georgia Railway Co. et al. v. Mallet, 2 Higgins (2 Tenn. Civ. App.), 454, 457.

"Juries intend to be both just and reasonable, but often, inexperienced in trial of such questions, excited inclinations of pity for those suffering, and sympathy with present distress, which does so much honor to our better nature under other circumstances, and so much to defeat the course of justice when operating to obscure the judgment in so serious a situation as the trial of any issues of human rights, combine to bring them to conclusions which are inconsistent with law and justice; and in such cases the court should always interpose, and preserve the rights of the parties under his more experienced and dispassionate apprehension of the law." Louisville & N. Railroad Co. v. Stacker, 86 Tenn., 343, 354, 6 S. W., 737, 741, 6 Am. St. Rep., 840.

Although the amount of damages to be awarded in an action for personal injuries and wrongful death is primarily a question for the jury, the very fact that the excessiveness of the verdict may be made a ground for a new trial negatives the idea that the judgment of the jury is to be regarded as infallible or conclusive.

██ It would serve no useful purpose at this time to trace the development of the Tennessee rule with respect to the power of the courts over excessive verdicts in actions for personal injuries or wrongful death. The existing rule seems to be that if the court is of opinion that the verdict is excessive, the verdict may be cured by requiring a remittitur on pain of the grant of a new trial if the remittitur is not accepted by the plaintiff. Grant v. Railroad Co., supra, page 409 of 129 Tenn., 165 S. W., 963; Fairbanks, Morse & Co. v. Gambill, 142 Tenn., 633, 649, 222 S. W., 5; Heggie v. Barley, 5 Higgins (5 Tenn. Civ. App.), 78, 86; Rhoton v. Burton, 2 Tenn. App., 164, 172; Baskin & Cole v. Whitson, 8 Tenn. App., 578, 590;

Freed v. Freed, 9 Tenn. App., 691, 697; Yarbrough v. Louisville & N. Railroad Co., 11 Tenn. App., 456, 460; Goebel v. Fleming, 13 Tenn. App., 473, 484; Central of Georgia Railway Co. v. Mallet, supra.

A multitude of cases illustrating the views of the courts of the country with respect to the pecuniary value of the life of a minor child are collated and digested in the following: L. R. A., 1916C, pp. 870-884; annotation 48 A. L. R., pp. 837-848; note 18 Ann. Cas., pp. 1225-1231; note Ann. Cas., 1915C, pp. 455-459; 8 R. C. L., pp. 850, 851, footnotes 14 and 15.

Looking to the consensus of judicial opinion thus disclosed as reflecting the "aggregate social consciousness" with respect to the "standards which time and experience have approved" (Central of Georgia R. Co. v. Mallet, 2 Higgins [2 Tenn. Civ. App.], 457), we are of the opinion that the amount of the present verdict is excessive to the extent of $3,500. The defendant's second and third assignments of error are therefore sustained, and a remittitur of $3,500 is suggested. If the remittitur thus suggested is accepted by the plaintiff, the judgment will be affirmed to the extent of $6,500, and judgment will be entered here accordingly for $6,500, with interest thereon from the date of the judgment below, and for the costs accrued in the circuit court; otherwise, the judgment will be reversed, the verdict of the jury will be set aside, and the cause will be remanded to the circuit court of Davidson county for another trial.

If the remittitur is accepted by the plaintiff, the costs of the appeal will be adjudged against the defendant and the surety on his appeal bond; otherwise, the costs of the appeal will be paid by the plaintiff.

Crownover and DeWitt, JJ., concur.