MRS. CLEO BIVIN, Plaintiff-in-Error, v. SOUTHERN OIL SERVICE, INC., Defendant-in-Error. — 394 S.W. (2d) 141.

Middle Section. April 23, 1965.

Certiorari Denied by Supreme Court July 19, 1965.

680

Joseph G. Cummings and William F. Howard, of Boult, Hunt, Cummings & Conners, Nashville, for plaintiff in error.

Frank Gorrell, of Bass, Berry & Sims, Nashville, for defendant in error.

HUMPHREYS, J. Plaintiff has appealed from a judgment in favor of defendant, entered on a verdict directed

at the conclusion of proof. The assignments, which are numerous, fall in three general categories: (1) Whether plaintiff made out a case of liability; (2) whether the court erred in excluding certain evidence plaintiff offered; (3) whether the court erred in admitting certain evidence over plaintiff's objection.

We have concluded (1) that plaintiff did not make out a case of liability; (2) that the evidence excluded would not have done this if admitted; (3) that any error committed in admitting evidence over plaintiff's objection is harmless in view of plaintiff's failure to make out a case of liability.

Briefly, these are the facts. On the evening of April 27, 1953, Shelvis D. Bivin, who owned his own truck and hauled crude oil from Kentucky fields to refineries in Nashville and elsewhere, arrived at the Southern Oil Service Refinery with a second delivery of crude oil for that day, after the refinery had closed. The night watchman was contacted, and he let Bivin's truck, which was accompanied by another of his trucks driven by his employee, Blankenship, onto the premises, and connected his truck to the pumping station to unload the crude oil. The night watchman, one Hollis Ingram, took a sample of the crude oil, placed in the control room of the pumping station, and hooked the pump up and began unloading. After this, Ingram left to go to a toilet. When he returned, Bivin was missing. Blankenship, who had heard Bivin call out something, and Ingram both searched for him and being unable to find him, notified the police and others, and after sometime Bivin's body was found inside one of the tanks by an employee of Southern Oil Service, C. N. Baggett, who was assisting in the search.

The tank in which Bivin's body was found was located near the rear of the Southern Oil Service property, several hundred feet behind the pumping station and was not the tank into which the oil was being delivered. His body was discovered when it was, only because Baggett noticed a hat on top of one of the storage tanks, and when he climbed up to the top to investigate, he saw a hole in the roof of the tank, and upon looking through the hole, saw Bivin's body.

On April 16, 1954, after the discovery of Bivin's body in the tank on April 27, 1953, Mrs. Cleo Bivin brought a wrongful death action against Southern Oil Service. Although the case was at issue and ready for trial in January of 1955, it was not called, and after the lapse of three years was placed on the retired docket, from which it was recalled on plaintiff's motion in April, 1963, and was finally tried in June, 1964, more than eleven years after Mr. Bivin's death.

The declaration sued for $100,000.00 damages on two grounds of liability. The first ground of liability was common law negligence in that the tank was maintained in a negligent manner and unsafe condition and this cost plaintiff's intestate, who was an invitee on the premises, his life. The second ground of liability was that there were certain provisions of a regulation of the Fire Marshal of the State of Tennessee requiring the maintenance of gasoline tanks of a minimum thickness of rust proof steel, and that these regulations were violated, and that this cost plaintiff's intestate his life.

By special plea guilt of negligence was denied; violation of the regulations was denied; that violation of such was the proximate cause of intestate's death was denied; and it was stipulated, according to the state-

ment of counsel at the oral argument of this appeal, that the special plea should be treated as denying that plaintiff's intestate was in the protective scope of the regulations. It was admitted decedent was on the premises for the purpose of unloading oil but it was denied he was an invitee insofar as the tanks were concerned; that as to the tanks and the tops thereof, he was a trespasser or bare licensee.

In addition to the facts we have recited, it must be mentioned that Bivin and other haulers would take samples of crude oil from their trucks to the laboratory at the rear of defendant's premises on occasion, and that there were no special directions or limitations on the use of defendant's premises by Bivin and the other haulers. It is, of course, upon this account plaintiff insists Bivin was an invitee at the time he met his death. It must also be mentioned that while the tank appeared to be safe and in good condition, its steel cover was rusted, corroded, and, as one witness described it, paper thin. Defendant was aware of the corrosive nature of the material kept in these tanks and that on this account they sometimes rusted out in as short a time as three months. And the testimony is that usually the tanks were only replaced when they began to leak.

Looking at all of this evidence from the point of view most favorable to plaintiff we have reluctantly come to the conclusion that while Bivin may have been an invitee as to the grounds of defendant, he was not such as to the tops of the oil tanks, and that when he went there he did so at his peril and without the protective benefit of the duty owed an invitee.

The law is well settled that a proprieter of property frequented by either the general public or persons

having particular business there, is only liable, in the absence of wilful or wanton negligence, for ordinary negligence with respect to the portion of the premises the invitee would ordinarily and reasonably be expected to frequent. In 38 Am. Jur. sec. 101, p. 762, this rule is stated thus:

"The duty owed by an owner or occupant of premises to an invitee for his safety is measured and limited by the nature of the invitation held out. His liability is only coextensive with the invitation; and to entitle a person to recover for injuries on the basis of a duty owed to him as an invitee, he must show that at the time of injury he was using the premises for a purpose contemplated by the invitation."

This general rule is further elaborated on in this same authority in secs. 132 and 133, thusly:

"The duty of the proprietor of a place of business which is open to public patronage to use ordinary care to make the premises reasonably safe for customers is generally limited to that part of the premises designed, adapted, and prepared for the accommodation of customers, or to which customers may reasonably be expected to go. The duty of the proprietor of a place of business to his customers does not require him to render safe for their use parts of the building reserved for use only by him and his employees, such as shipping rooms and warerooms, unless he expressly or impliedly invites or induces a customer to enter such a reserved part, or such an invitation is given by one authorized to act for him. It has been held that a person who visits a portion of a store not frequented by visitors, entirely on his own business, without the owner's invitation or knowledge, is a mere licensee. * * *."

This rule has been strictly followed in Tennessee. In Rogers v. Chase, 5 Tenn.App. 525, the plaintiff fell through an open hatchway in a storage room of a furniture store, not open to the public, and this court said that it is only those parts of the premises where the person invited is expected to be, that the owner is required to keep in a reasonably safe condition. In Chattanooga Warehouse & Cold Storage Co. v. Anderson, 141 Tenn. 288, 210 S.W. 153, plaintiff fell through an open elevator shaft, and in the course of holding he could not recover because he was visiting a portion of the premises to which he was neither expressly nor impliedly invited, our Supreme Court said:

"The general rule is succinctly, but accurately, stated by Mr. Cooley in his work on Torts (pages 604, 607), and approved by the Supreme Court of the United States in Bennett v. L. & N. Railroad Co., 102 U.S. 577, 26 L.Ed. 236, as follows:

'When one expressly or by implication invites others to come upon his premises, whether for business or for any other purpose, it is his duty to be reasonably sure that he is not inviting them into danger, and to that end he must exercise ordinary care and prudence to render the premises reasonably safe for the visit.'

It is not insisted that Mr. Anderson was on the premises by express invitation; it therefore becomes necessary to determine whether he was there by implied invitation.

Implied invitation is thus defined by Shearman & Redfield on Negligence (6th Ed.) sec. 706:

'Invitation by the owner or occupant is implied by law, where the person going on the premises does so in the

interest or for the benefit, real or supposed, of such owner or occupant, or in the matter of mutual interest, or in the usual course of business, or where the person injured is present in the performance of duty, official or otherwise.'

The great weight of authority, however, qualifies this definition of implied invitation by providing that where one goes upon the premises of another, for any of the purposes stated above, he must confine himself to such parts of the premises as are included in the invitation. Such implied invitation does not involve in its scope such parts of the establishment to which the public is not invited. It is only those parts of the premises where the person invited is expected to be that the owner is required to keep in a reasonably safe condition.

As stated by one writer, operators of factories and mills do not impliedly invite customers into parts of their plants where the machinery is being operated, hotel keepers do not invite guests to their engine rooms, and carriers do not invite passengers to the many places not fitted up for their use. The foregoing conclusion is supported by the following authorities. (Citing cases)

The theory of negligence was well stated by this court in Williams v. [City of] Nashville, 106 Tenn. [533,] 538, 63 S.W. [231], 233, the court saying:

'For the theory of all negligence cases is that the defendant has violated some legal duty he owed plaintiff. So where such duty does not exist, however unfortunate the injury may be, and free from negligence, yet he must alone bear the consequences; he cannot impose them upon one under no obligation in law towards

him, save not to inflict, directly or indirectly, wanton injury upon him.' ''

In Worsham v. Dempster, 148 Tenn. 267, 255 S.W. 52, the Supreme Court reversed this Court which had affirmed a circuit court judgment in a case where a defendant was injured on a portion of premises to which he had neither been expressly nor impliedly invited, holding that an implied invitation does not extend to parts of the establishment not open to the public or to the particular invitee, reaffirming the Chattanooga Warehouse & Cold Storage Co. opinion.

■ This being the settled law in this case, and it being uncontradicted in the plaintiff's evidence, and it appearing from all of the evidence without any question, that the delivery of the crude oil and its receipt by Southern involved no duties or activities which required or even contemplated Bivin being on top of one of the tanks, and it being uncontradicted that no one had any duties or activities with respect to the top of this tank and other tanks on the premises except employees, and it being further uncontradicted that no one ever went on top of these tanks except employees, we are compelled to the conclusion that decedent Bivin was a bare licensee or trespasser on top of the tank, and that Southern Oil would not be liable for his death, except that it caused it either wilfully or wantonly.

■ We do not conceive the rule to be any different where the negligence complained of consists solely of the non-compliance with a regulation, though it have the force of a statute. While it is well settled in Tennessee that the violation of a statute is negligence which can support a judgment, such negligence has always been treated as being on the same plane with simple common

law negligence, unless of course the violation was wilful, or purposeful, or wanton, or in so reckless a manner as to indicate this attitude of mind.

"It has long been well settled in this State that a violation of a statute which causes injury to one within the protection of the statute is negligence per se and actionable. Queen v. Dayton Coal & Iron Co., 95 Tenn. 458, 32 S.W. 460, 30 L.R.A. 82, 49 Am.St.Rep. 935; Riden v. Grimm Bros., 97 Tenn. 220, 36 S.W. 1097, 35 L.R.A. 587; Memphis St. Ry. Co. v. Haynes, 112 Tenn. 712, 81 S.W. 374; Adams v. Cumberland Inn Co., 117 Tenn. 470, 101 S.W. 428; Chattanooga Ry. & Light Co. v. Bettis, 139 Tenn. 332, 202 S.W. 70; Tennessee Cent. Ry. Co. v. Page, 153 Tenn. 84, 282 S.W. 376; Inter City Trucking Co. v. Daniels, 181 Tenn. 126, 129, 178 S.W. (2d) 756, 757.

'Generally speaking, the violation of a rule of the common law, a statute, a municipal ordinance, or any failure to perform a duty imposed for the public safety, is actionable negligence, and whoever suffers in consequence of the violation or nonperformance of the law may maintain an action against the offender for the injuries sustained. Adams v. [Cumberland] Inn Co., 117 Tenn. 470, 101 S.W. 428.' Mr. Justice Cook in Tennessee Cent. Ry. Co. v. Page, 153 Tenn. 84, 91, 282 S.W. 376, 377." Null v. Elec. Power Board of City of Nashville, 30 Tenn.App. 696, 707, 708, 210 S.W.(2d) 490, 494.

Plaintiff-in-error tacitly recognizes this to be the law and makes the contention the defendant's manner of maintaining the tanks amounted to wilful, wanton, or gross negligence, and so there can be a recovery.

We are unable to accept this contention for two reasons. First, the declaration does not so allege and so

the suit was not tried below on the theory of wilful, wanton, or gross negligence. So, of course, we cannot try the case here on this theory of liability.

■ The second ground on which we must reject this contention is, that no matter how you look at the manner in which Southern maintained its tanks, and especially the tops thereof, in view of the uncontradicted fact that the general public was not invited to the tops thereof and Southern had never had any experience with this, its failure to take steps to replace tank tops which had gradually corroded or rusted to a condition of non-compliance with the regulation could amount, in our opinion, only to simple negligence. Certainly, there was nothing purposeful or wilful, or wanton, or reckless in Southern's failure to replace these tank tops on which no one was expected to step or walk until such time as they gave evidence from appearance this was needed. In truth, there could be some argument whether this injury meets the test of foreseeability—even as that test has been extended by such cases as Southeastern Steel, etc. v. Luttrell, 48 Tenn. App. 522, 348 S.W.(2d) 905, and others.

In addition to this, we think it is evident from reading the regulations that they were not intended to provide a tank top safe to walk on and that this was not within the remote contemplation or purpose of the regulations. See Footnote 1.

---

1. "STANDARDS OF THE NATIONAL BOARD OF FIRE UN-DERWRITERS FOR THE INSTALLATION OF CONTAINERS FOR STORING AND HANDLING FLAMMABLE LIQUIDS.
INTRODUCTION
These standards cover recommended practice compliance with which will not, however, remove all insurance charges for the storage or handling of such liquids."

Two things become evident from reading the regulation. The first is that the regulation as it states, is to protect from hazards of fire and explosion, and its provi-

"CLASS F. Aboveground Storage.

This class of storage consists of aboveground tanks, and is that found in connection with oil development, refineries, distributing stations and manufacturing plants. The hazard involved is that of exposure from the burning liquid in the tank, flow of the liquid to other properties through rupture, or, with crude petroleum, boil over, and the possibility of explosions from vapors which may be liberated from the tank or piping incident to it. For this reason above ground storage tanks of large capacity should, so far as possible, be located away from the congested portions of communities. The only type of tank recognized in these standards is all-steel, of substantial vapor-tight construction, and suitably vented; the probability of the above contingencies is materially less than with tanks of inferior construction."

"Section 55 is entitled, 'Material and Construction of Tanks.' Subsection (a):

Tanks, (including tops) shall be constructed of steel or wrought iron of a minimum gauge (U. S. Standard) depending upon the capacity as given in Table 1. For liquids heavier than 35' A.P.I., tanks may be of reinforced concrete, in accordance with the Standards for the Design and Construction of Concrete Fuel Oil Storage Tanks."

"Section 53. Volatile flammable liquids shall be kept in metal safety cans, or other approved metal containers.

Class F. Aboveground storage.

This class of storage consists of aboveground tanks and is that found in connection with oil development, refineries, distributing stations and manufacturing plants. The hazard involved is that of exposure from the burning liquid in the tank, flow of the liquid to other properties through rupture, or, with crude petroleum, boil over, and the possibility of explosions from vapors which may be liberated from the tank or piping incident to it. For this reason aboveground storage tanks of large capacity should, so far as possible, be located away from the congested portions of communities. The only type

sions are not "requirements", but rather merely "recommended" practices. (Regulation p. 1). The second is that it was not designed to provide a tank roof suitable for walking on, for if that had been its purpose a thickness of metal would have been provided for in relation to the diameter or circumference of the tank top, and

of tank recognized in these standards is all-steel, of substantial vapor-tight construction, and suitably vented; the probability of the above contingencies is materially less than with tanks of inferior construction.

Tanks and property exposed thereby, when located as hereinafter required, will not always escape exposure and other charges; hence in all cases, plans and specifications should be submitted to the rating organization having jurisdiction before locating tanks that the charges, including exposures, may be accurately known and considered."

"54. Capacity and Location of Tanks.

(a) The location of a tank with respect to distance from tank shell to line of adjoining property or nearest building shall depend upon the construction contents, equipment, and greatest dimension (Diameter, length, or height) of the tank and shall be in accord with the following provisions, except, that if the adjacent property is occupied for the purpose of the same type of petroleum storage, by mutual agreement of adjoining property owners, the property line may not be considered in measuring the distance from tanks of either storage plant but the distance may be measured from nearest tanks without regard to location of the property line.

Group A Tanks. Any all-steel, gas-tight tank constructed in compliance with these or equivalent standards and equipped either with (1) an approved permanently attached extinguishing system or (2) an approved floating roof, which is to be used only for the storage of refined petroleum products or other flammable liquids not subject to boil-over, shall be so located that the distance between shell of tank and property line or nearest building shall be not less than the greatest dimension (diameter, length or height) of the tank, except that such distance need not exceed 120 feet.

there would have been provision for undergirding it in proportion to the expected weight of traffic on it.

It is settled law that to afford a right of action for injury from the violation of a statute or ordinance, complainant's injury must have been such as the statute

Group B Tanks. Any all-steel gas-tight tank constructed in compliance with these or equivalent standards but not equipped either with (1) an approved permanently attached extinguishing system or (2) an approved floating roof, which is to be used only for the storage of refined petroleum products or other flammable liquids not subject to boil-over, shall be so located that the distance between the shell of tank and property line or nearest building shall be not less than 1½ times the greatest dimension (diameter, length or height) of the tank, except that such distance need not exceed 175 feet.

Group C Tanks. Any all-steel, gas-tight tank constructed in compliance with these or equivalent standards and equipped either with (1) an approved permanently attached extinguishing system or (2) an approved floating roof, which is to be used for the storage of crude petroleum or other flammable liquid subject to boil-over, shall be so located that the distance between shell of tank and property line or nearest building shall not be less than twice the greatest dimension (diameter, length or height) of the tank except that such distance shall be not less than 20 feet and need not exceed 175 feet.

Group D Tanks. Any all-steel, gas-tight tank constructed in compliance with these or equivalent standards and not equipped either with (1) an approved permanently attached extinguishing system or (2) an approved floating roof, which is to be used for the storage of crude petroleum or other flammable liquid subject to boil-over, shall be so located that the distance between shell of tank and property line or nearest building shall be not less than three times the greatest dimension (diameter, length or height) of the tank except that such distance shall be not less than 20 feet and need not exceed 350 feet.

(b) The minimum distance between shells of any two all-steel, gas-tight tanks shall be not less than one-half the greatest dimension (diameter, length or height) of smaller tank except that such dis-

or ordinance was intended to prevent. If none of the consequences which the enactment was designed to guard against resulted from its breach, the breach does not constitute an actionable wrong, even though some other injurious consequence has resulted. 38 Am.Jur. sec. 163, p. 834.

■ Our courts have held that one not a beneficiary of a statute may not base an action or a defense on its violation. Vinson v. Fentress, 33 Tenn.App. 359, 232 S.W.(2d) 272; Chattanooga Ry. & Light Co. v. Bettis, 139 Tenn. 332, 202 S.W. 70; Borden v. Daniel, 48 Tenn.App. 314, 346 S.W.(2d) 283.

---

tance shall not be less than 3 feet and for tanks of 18,000 gallons or less the distance need not exceed 3 feet.

(c) Tanks shall be so located as to avoid possible danger from high water.

(d) When tanks are located on a stream without tide they shall, where possible, be down stream from burnable property."

"55. Material and Construction of Tanks.

(a) Tanks, including top, shall be constructed of steel or wrought iron of a thickness depending upon the capacity and to be figured in accordance with the following table or formulae. No open tank shall be used. For liquids of 35° A.P.I. or heavier, tanks may be constructed of concrete in accordance with the standards for the Design and Construction of Concrete Fuel Oil Storage Tanks."

"3. Vertical tanks over 1,100 gallons capacity.

Tanks of this class shall be of such material and so constructed as to give a factor of safety of at least 2.5.

The minimum thickness of shell or bottom shall be 3/16 inch. The minimum thickness of roof shall be ⅛-inch."

"(c) Tanks shall be rustproof as specified in paragraph 3(c)."

Bill of Exceptions pp. 186<br>187, 188, 189.

■ Finally we do not think this regulation applies because it was promulgated by the State Fire Marshal who has no duties or power to regulate, respecting labor or public safety, apart from hazards of fire and explosion, these powers being vested in the Commissioner of Labor. T.C.A. secs. 4-403, 50-101 et seq., 53-2413 et seq.

■ As we have already indicated we are of opinion the assignments of error with respect to the admission or exclusion of evidence, if ruled in favor of plaintiff-in-error, would not result in a reversal in view of the harmless error statutes. The evidence which was offered and excluded even if admitted, could not alter the fact that decedent Bivin was not an invitee on the tank top, which we hold he had to be before Southern Oil would be liable. This being so, the exclusion of this evidence was harmless.

Note 1. The assignments of error here dealt with and overruled appear in Footnote 2 below.

---

2. "VI.

The Court erred in sustaining the defendant's objection to the introduction of the Nashville Police Department homicide report, which was offered as an exhibit to the testimony of the plaintiff's witness, Harry Mott, and as Exhibit 'A' to the disposition of the plaintiff's witness, Frank W. Muller, Sr.

VII.

The Court erred in sustaining the defendant's objection to the following testimony of the plaintiff's witness, Lionel Bivin, offered in the absence of the jury:

Q. 'If you will, tell us what Fats told you that night in Mr. Bruno Borger's presence, what he was doing on the tank?

A. Well, as this tank was unloaded, it got what we call a dome in the top of it, these open, he went up to shut the dome, he had a screw driver in his pocket * * *

What we have just said is likewise true with respect to defense evidence admitted over objection. If we disregard this evidence entirely, we are still compelled to the conclusion Bivin was not an invitee on the tank top and so its admission was harmless.

---

Q. Are you talking about the tank truck?

A. The tank truck. As he bent over to shut the dome, the screw driver fell in the tank. He backed the truck out, and told Fats to pull his truck under, and while he was unloading it, he would get a piece of wire and fish the screw driver out of the tank.

Q. Did he tell you what he was doing on this particular tank when he fell through?

A. Shorty told me that.

Q. Shorty is Fats Blankenship?

A. That's right, I called him Shorty. Shorty is Fats.

Q. Was this in Mr. Bruno Borger's presence?

A. Said he'd go up there and get a gauge stick and put a piece of wire on it, and get that out.'

### VIII

The Court erred in sustaining the defendant's objection to the testimony of the defendant's witness, Bruno Borger, as follows:

'Q. All right, did you determine why the man was on the tank?

A. I had been told that presumably he had lost his screwdriver in one of his tank trucks and that he was trying to get that screw driver out. Nobody really knew. That is what I was told, and that he supposedly was looking for a piece of wire.

Q. That is the information you gave to his brother when he drove down here that night, is it not?

A. I don't remember that, of course, but that is what I was told, that that was apparently the reason why he wandered away from his truck, to try to get this screw driver out. Now who told it to me, I don't remember. It might have been Blankenship.

 However, we are not of opinion the trial court erred as complained in permitting certain defense witnesses to testify that decedent Bivin had no duties expected of him with respect to delivery of the oil, or his

Q. You don't remember whether Blankenship or your employee, Wallace?

A. I do not know who told it to me.

Q. But it was somebody on the premises there that night?

A. That he presumably lost his screw driver in the tank and he wanted to get it out and he apparently went to find a piece of wire and that is what I was told.

Q. So you satisfied yourself as to those facts being true, that night, did you not?

A. I could have been—yes, I thought that might have been a good reason, because he probably wanted to bring another load of crude oil in and he—

Q. But you satisfied yourself, that night, as to the reason he was on this tank?

A. That's right. There would have been no other reason for him to go on that tank at all.

Q. You don't know whether there had been any other reason or not?

A. To the best of my knowledge, I wouldn't know. He had no business up there at all.

Q. You don't know whether anybody sent him up there to get the measuring stick or not?

A. No, I don't know that, but it was—it would be completely out of the ordinary.'

## IX.

The Court erred in sustaining the defendant's objection to certain portions of the certified copy of the death certificate which was made plaintiff's Exhibit No. 6."

presence on the premises, which could explain his going on top of the tank and stepping off onto its roof. This is not testimony of a conclusion of the witness, but testimony as to a condition or state of fact. When it is necessary to prove the negative of a matter there are times when it can only be done as this was. In essence, the testimony is simply that there were no duties or activities expected of Bivin in connection with his presence on the premises and the delivery of the oil that required or contemplated his going on top of a tank, especially when this was not a tank into which the crude oil was being delivered. The truth of this statement could certainly be explored and determined by cross-examination, in the course of which it could have been shown, if it was a fact, that Bivin did have duties on top of the tank. But this was not done.

Being of opinion the assignments raising these matters are not good, we overrule them. (These assignments are set forth in Footnote 3).

---

3. "II.

The Court erred in admitting, over the plaintiff's objection, the following testimony of the defendant's witness, Bruno Borger:

'Q. Now, Mr. Borger, did Mr. Bivin, or anybody, other than an employee of Southern Oil, have any business whatsoever on the tanks?

A. No. No, he didn't.

Q. Mr. Borger, in the performance of his duties, was there any requirement or necessity for Mr. Bivin to go up on top of these tanks?

A. No, sir.

Q. Who had the right to go upon those gas tanks?

A. Only the employees.

Another contention of plaintiff-in-error we must deal with before concluding our opinion is, the argument that, if decedent Bivin came to Southern Oil's premises as an invitee, there is a presumption, continuing until overcome by evidence, that he continued in this status and so was an invitee on the tank top. This insistence is predicated on the rule that a fact once shown to exist is presumed

---

Q. Mr. Borger, at any time, have you ever seen anyone but employees on top of those tanks?

A. No.'

### III.

The Court erred in admitting, over the plaintiff's objection, the following testimony of the defendant's witness, Hollis Ingram:

'Q. Did Mr. Bivin have any business up on those tanks?

A. No, sir.

Q. Hollis, had you ever seen anyone other than employees of Southern Oil Service up on those tanks?

A. No, sir.'

### IV.

The Court erred in admitting, over the plaintiff's objection, the following testimony of defendant's witness, C. M. Baggett:

'Q. Now, had you gotten up on any of these tanks to look for Mr. Bivin?

A. No, sir, we hadn't gotten up on them.

Q. Why?

A. There wasn't any reason for anybody to be on a tank.

THE WITNESS: I would say in my opinion, I wouldn't think so.

MR. CUMMINGS: We except to his opinion, if Your Honor please.

THE COURT: I overruled your objection to the first answer, Mr. Cummings, which answer I think was responsive to the question. But as to his opinion, I sustain the objection.' "

to continue until the contrary is shown. Harden v. State, 188 Tenn. 17, 216 S.W.(2d) 708; Bolling v. Anderson, 63 Tenn. 550.

 This presumption, as all other presumptions that are not indisputable exists simply because the fact presumed is a warrantable inference from the fact proved, and is dissipated by evidence or inferences from evidence to the contrary. So, it cannot, in this case have the effect contended for. Here from all the evidence and from the very nature of the place where Bivin met his death the conclusion seems to us to be inescapable that Bivin was not an invitee. There is no evidence that Southern had any reason on earth to expect Bivin to go on top of the tank and, moreover, it appears without controversy or dispute that this tank top and others on the premises were not open to the public or to Mr. Bivin. So, the presumption cannot be availed of by plaintiff-in-error. See Greer v. McKee, 13 Tenn.App. 625; Long v. Tomlin, 22 Tenn.App. 607, 125 S.W.(2d) 171; Southern Motors v. Morton, 25 Tenn.App. 204, 154 S.W.(2d) 801.

In reaching the conclusions here expressed we have considered Jack M. Bass & Company v. Parker, 208 Tenn. 38, 343 S.W.(2d) 879; Crane Co. v. Simpson, 6th Cir., 242 F.(2d) 734; Taylor v. McCowat-Mercer Printing Co. (Tenn.) 27 F.Supp. 880; and Christofiel v. Johnson, 40 Tenn.App. 197, 290 S.W.(2d) 215, which are strongly relied on by plaintiff-in-error, but are of opinion these cases do not apply. In each of these there were facts which fairly raised the issue whether the injured party had an express or implied right to be where he was, in that it was within the range of reason to expect a person such as he was to be there. But that is not the case here. Here, there are no such facts.

It cannot be denied that this case deals with the dreadful, tragic death of a man who is described as friendly, kindly, and a man of great value in every way to his community and to his family. Still, that cannot warrant ignoring the settled law we have cited in ruling against a recovery. And, while we have not, of course, considered or relied on plaintiff-in-error's long, unexplained, delay in pressing for a recovery because of the death of this happy, kindly, hardworking husband, we cannot but believe that this long delay in so doing resulted from very, very serious doubts that Southern Oil was legally responsible therefor. And, while we regret it, as it is the growing purpose and object of law to recompense for loss, it is still the law in Tennessee that there can be such recompense only when the loss is the legal fault of the one called on to pay. That not being the case here, we affirm the judgment of the trial court.

Shriver and Puryear, JJ., concur.