Billy D. ODUM, Appellant,

v.

James P. HAYNES and David C. Kotler and wife, Joan Kotler, Appellees.

Billy D. ODUM, Appellant,

v.

MEMPHIS LIGHT, GAS AND WATER DIVISION, et al., Appellees.

Court of Appeals of Tennessee, Western Section.

Oct. 10, 1972.

Certiorari Denied by Supreme Court May 7, 1973.

William I. McLain, Memphis, for appellant Billy D. Odum.

Robert M. Fargarson, Memphis, for appellee James P. Haynes.

Dale Woodall, of Evans, Petree, Cobb & Edwards, Memphis, for appellees, David C. Kotler and wife, Joan Kotler.

Leo Bearman, Frank B. Gianotti, William A. Sands, Memphis, for appellees, Memphis Light, Gas and Water Division, and others.

NEARN, Judge.

This is a plaintiff's appeal from a jury verdict for one of the defendants and from the Trial Court's action in directing a verdict for the other defendants.

Billy D. Odum filed one suit against the Memphis Light Gas & Water Division and another against James P. Haynes, and David C. Kotler and wife, Joan Kotler, for personal injuries sustained by him on September 16, 1967, while attempting to install a citizens' band two-way radio antenna at the rear of apartment No. 5, 1125 Frayser Boulevard, Memphis, Tennessee. The injuries sustained by the plaintiff were electrical shock and burns sustained when the antenna came in contact with or in close proximity to the power lines of the defendant utility company. The antenna was being erected by Odum and Haynes and the nephew of Haynes, for Haynes' benefit, at the rear of the apartment occupied by Haynes and owned by the Kotlers. The suits were consolidated for purposes of trial.

In substance, the first Count of the Declaration against the utility company charged the defendant with negligence in: (1) unnecessarily placing an uninsulated 7200 volt electric wire across private property and in dangerous proximity to an apartment building without any notice or warning whatsoever of the dangerous condition thereby created; and (2) in not placing the said electric wire underground.

The second Count charges a violation of an ordinance of the City of Memphis governing the insulation of wiring.

In the Declaration against the Kotlers and Haynes, it was alleged that the defendants Kotler, along with the utility company, placed and maintained the uninsulated electrical lines in a negligent manner and, in substance, the same acts of negligence charged to the utility company in the first mentioned Declaration were charged to the defendants Kotler.

As to the defendant Haynes, he was charged with negligence in failing to warn plaintiff of the dangerous condition there existing and in negligently causing the top of the antenna to come into contact with the electrical energy carried in the wires by causing the top portion of the antenna to be moved into that field of energy while the plaintiff was grasping a lower portion of the antenna.

The utility company denied all acts of alleged negligence and averred that the plaintiff's negligence was the proximate cause of his injuries, or that the plaintiff was guilty of proximate contributory negligence, or that the combined negligence of Haynes, his nephew and the plaintiff was the efficient intervening and proximate cause of plaintiff's injuries. By Special Plea the utility company further defended on the grounds that the electrical installation was in excess of the standards as set out in the National Electrical Safety Code, and that the City Ordinance relied upon in plaintiff's Declaration had been repealed and the City Ordinance substituted for the repealed ordinance required compliance with the National Electrical Safety Code which had been in all things complied with by the defendant utility company. Further, that plaintiff knew of the location of the wire, the inherent danger, yet participated in the erection of the antenna in close proximity to the electrical wire and that said act was negligence on plaintiff's part. Further, that plaintiff knew or should have known that had the antenna been properly grounded, no harm would have come to him, yet he failed to use this safety precaution and with full knowledge assumed all risks of injury by reason of accidental contact with the electrical transmission line. By an amendment to the Special Pleas, the utility company also relied upon the provisions of the National Electrical Code of 1965 and averred that the manner in which plaintiff sought to erect the antenna was in violation of that code.

The defendant Haynes denied any acts of negligence on his part or any breach of any duty to plaintiff and averred that plaintiff had equal or superior knowledge of the dangers involved, but that if he, Haynes, was negligent, then plaintiff was negligent in like regard as each was a part of the same transaction with the same control and knowledge.

The defendants Kotler denied all responsibility for the accident or the condition of the electrical installation. It was averred in their Answer that an easement had been given by them to the utility company for the erection of an electrical transmission system over their property but that the Kotlers had nothing to do with the installation or the maintenance of the system. Further, that plaintiff's acts were the proximate cause of his injuries or proximately contributed to them or that the acts of the plaintiff and those acting with him were the effective and intervening cause of plaintiff's injuries.

The apparatus sought to be erected, which so far in this Opinion has been termed "antenna", actually consists of a sectionalized push-up pole, to the top of which is attached the true antenna. The true antenna acts as an extension of the push-up pole with four "fingers" or radials which extend at right angles outwardly for a distance of about eight feet. Technically speaking, the antenna consists only of the radials or "fingers" and the shaft or pole to which they are attached. The shaft or pole of the true antenna is about seventeen (17) feet in length. The true antenna is

affixed to and its base rests upon the topmost section of the push-up pole. The push-up pole sections fit one into the other and are extended in the manner of a telescope with each section of the push-up pole, from the base section upward, having a smaller circumference than the section into which it fits. In this Opinion, when we use the word "antenna", we shall mean the entire apparatus unless otherwise designated.

At the close of the plaintiff's proof, the Court directed a verdict for the defendant Haynes and the defendants Kotler. At that time, a motion for a directed verdict was also made by the utility company but was denied. Proof was adduced by the remaining defendant utility company and that case was submitted to the jury which resulted in a verdict for that defendant.

Twelve Assignments of Error have been made in this Court. The first complains of the Trial Court's action in directing a verdict for the defendant Haynes and the defendants Kotler. The fourth complains of the Trial Court's action in withdrawing the issue of gross negligence on the part of the utility company from consideration by the jury. The remaining Assignments of Error complain of the admission of evidence or errors of either commission or omission in the Court's charge to the jury.

The proof shows that plaintiff Odum is a long-haul truck driver with no training or experience in the field of electricity. Prior to the date on which he sustained his injuries, plaintiff had purchased a citizens' band radio and antenna from a friend in Little Rock, Arkansas. When he purchased the radio and antenna, he observed the manner in which the antenna was disasembled by the seller. With this knowledge gained by observation, plaintiff was able to erect the antenna at his home and attach it to the radio.

The defendant, James P. Haynes, is also a long-haul truck driver and a friend of the plaintiff. Haynes purchased a citizens' band and an antenna identical to, or almost identical to, the one owned by Odum. Haynes, like Odum, had no training or experience in the field of electricity and, likewise, none in the field of erecting antennas. Knowing that Odum had erected his own antenna, Haynes, on the morning of September 16, 1967, called Odum and requested of him that he assist Haynes in the erection of the antenna that he had just purchased. The antenna was to be erected at the apartment of Haynes. Odum was reluctant to assist because his wife expected him to do some painting around the house that day. Haynes suggested that it would only take a few minutes to erect the antenna and that they could have the job done before Mrs. Odum returned from shopping. Odum agreed to assist Haynes. Haynes, along with his nephew, came by the Odum home and the three of them drove to the Haynes apartment. Haynes decided to affix the antenna at the southwest corner of the porch at the rear of the apartment. The building in which the Haynes apartment is located is a two-story apartment building. The rear porches of the apartments are located one over the other; that is, the floor of the porch of the top apartment serves as the ceiling of the porch of the lower apartment. The apartment building runs generally in an east-west direction and the roof of the porch of the top apartment appears to us to extend about four feet to the south of the side of the building proper. There are three metal posts or poles located along the porch which extend from the ground to the ceiling of the top porch. Facing the rear porches, they would appear somewhat like the Roman Numeral III with the floor of the top porch represented by a horizontal line drawn equidistant from the top and bottom: viz: III. Approximately ten feet south of the apartment building proper and approximately ten feet west of the southwest corner of the roof porch extension, there is located the utility pole of the defendant utility company. Approximately twenty-three feet west of the utility pole there is located a support pole with a guy wire running from the utility pole to the

support pole. The utility pole is thirty feet high and the support pole is considerably lower. Located at the top of the utility pole is an uninsulated wire, line or conductor of electricity which carries 7200 volts. About three feet below the 7200 volt line there is located a neutral line. Near the location of the neutral line on the pole there is located a transformer about the size of a garbage can. Running down from the 7200 volt line to the top of the transformer is an uninsulated line. Running from the bottom of the transformer to a conduit on the apartment building is an insulated service line which carries approximately 220 volts.

It was decided by Haynes and Odum that the antenna would be affixed for support by means of wire, straps or whatever was at hand, to the metal porch pole located at the southwest corner of the porch. This was the corner closest to the utility pole and lines.

Odum went to the roof of the apartment building with the radials to be affixed to the top part of the antenna. Odum, when he walked across the roof, was about eye level with the wires on the pole and observed them. Haynes and his nephew extended the push-up pole from the ground to where Odum could grasp it. It was Odum's intention to pull up the push-up pole a sufficient height so that the top part of the antenna with the eight foot radials would be above and clear the power lines when the entire apparatus was raised in an upright position and located at the southwest corner of the porch. Odum affixed the radials to the lower part of the true antenna. This work was accomplished at the northwest corner of the porch where it joined the main building. Odum testified that the push-up pole was extended about thirty-five feet, to which had been added the seventeen foot top portion with radials. Odum further testified that by his "eye" measurement, he concluded the radials would be over and clear the wires when the unit was erected. Therefore, the entire apparatus would be approximately fifty-two feet in height. According to plaintiff's testimony, the entire apparatus was left in an almost upright position in the corner where the porch joined the main building and Odum descended to the ground. The antenna was not grounded.

Prior to erecting the antenna in the position as before described, Haynes, his nephew and Odum discussed the presence of the wires on the utility pole and all agreed that they wanted to stay clear of them as it would be dangerous to come into contact with them. Odum testified, and it was not controverted, that there were no signs on the pole warning of high voltage. Odum further testified that before the accident he was of the opinion that the lines on the utility pole carried only about 220 volts, but if he had known that the line carried 7200 volts, he would not have engaged in attempting to erect the antenna anywhere near the lines. A resident of the apartment complex came by and cautioned the parties about the wires. As part of plaintiff's proof, the pretrial deposition of defendant Haynes was read wherein Haynes testified that at the time he did not know the voltage carried by the line, but thought it to be around 400 volts. Haynes did not communicate to Odum his thoughts about the voltage and Odum did not communicate to Haynes his thoughts on the subject.

After Odum descended from the roof, he placed himself at the southwest corner of the ground floor porch. Haynes' nephew placed himself on the second floor porch. Haynes went to the base of the push-up pole. The plan was to move or slide the antenna along the porch roof edge while in its upright position from the inside corner to the outside corner of the porch. Odum placed the front portion of his body against the corner porch pole and extended his arms around it, reaching toward the building proper in order to grasp the antenna when it was moved into his reach. Haynes grasped the base of the antenna and his nephew, from the second floor porch, grasped the upper part of the antenna to

guide it to the corner where Odum was located. As the pole began to move and to come within the grasp of Odum, and after Odum grasped it, Haynes moved the base of the push-up pole and one of the eight foot radials somehow came in contact with or in close enough proximity to the 7200 volt line so as to cause a charge of electricity to go from the line through the antenna and through Odum to the ground. The record is not clear whether or not Haynes or his nephew suffered any injuries from the discharge of electricity, but the front portion of Odum's body and his fingers were severely burned and he was severely shocked.

The injuries of the plaintiff were not seriously contested below. Therefore, for the purposes of this Opinion, suffice it to say that they are serious and permanent.

Odum testified that he was concentrating on his job of steadying the antenna and could not see the top of the antenna or its radials because of the second floor porch and trusted that Haynes and nephew would keep the antenna or its radials away from the wires. Plaintiff also testified that he thought the top wire on the utility pole (the 7200 volt line) was a guy wire as it appeared to him that it went through the utility pole and to the support pole. The photographs in evidence show that the guy wire from the support pole to the utility pole is attached to the utility pole at a point somewhat near the point where the 7200 volt line is attached to the utility pole.

The foregoing account of events is a synopsis of all of the material proof relating to the liability of the defendant Haynes.

Counsel for appellant contends that the Trial Court was in error in directing a verdict for defendant Haynes because Odum enjoyed the status of an invitee and that Haynes owed to Odum the duty to keep his premises in a reasonably safe condition, and to give warning of any latent or concealed perils also, that it was for the jury to decide whether or not Haynes ex-

ercised ordinary care and prudence toward Odum under the circumstances, and whether or not the base of the antenna was moved by Haynes in a negligent manner so as to permit the radials to come into contact with the 7200 volt line. Reliance is made upon the cases of Garis v. Eberling (1934 M.S.) 18 Tenn.App. 1, 71 S.W.2d 215; Hatcher v. Cantrell (1933 M.S.) 16 Tenn.App. 544, 65 S.W.2d 247; Rogers v. Garrett (1965) 217 Tenn. 282, 397 S.W.2d 372; and other authorities for this position.

■ We would first note that defendant Haynes is not the owner of the premises where the accident occurred. Haynes is a tenant. The utility poles, wires, transformers, etc., were not under the control of Haynes and he had no option as to their location, nor any duty to maintain them, and they were not located on any part of the premises he had leased. It is the duty of the occupier of premises to maintain those premises in a reasonably safe condition as to invitees and to warn of latent defects. Broome v. Parkview, Inc. (1962 E.S.) 49 Tenn.App. 725, 359 S.W.2d 566; Walls v. Lueking (1959 E.S.) 46 Tenn. App. 636, 332 S.W.2d 692. This rule of law arises because the occupier has control of the premises, maintains the premises, and therefore has a superior knowledge of its condition. Because of this superior knowledge, the law, in order to protect the innocent insofar as possible from avoidable injury, has placed upon the possessor of that superior knowledge the duty to communicate to an invitee that knowledge of latent defects. The injury-producing agent in this case, the 7200 volt line, was not under the control of Haynes, nor did he have the duty to maintain it. The proof does not show that Haynes had any superior knowledge of any defect, if any existed, or condition that was not known to Odum. The fact that Haynes was under the impression or thought the line carried about 400 volts, while Odum thought it carried about 220 volts, can hardly be considered superior knowledge of the true state of af-

fairs because: (a) both were wrong, (b) the wires were seen by both, and (c) both knew that contact with them would cause injury.

The case of Garis v. Eberling, supra, is not in point on the issue of premises invitee as the facts involved an injury caused by a defective condition created by the property owner.

Neither, do we believe the case of Rogers v. Garrett, supra, is applicable on that issue. In that case, plaintiff was injured while assisting defendant in the felling of a tree. Defendant was an experienced woodsman and had assured plaintiff that he was in a safe place and that no harm would come to him. Plaintiff knew nothing of felling trees and was unaware of the peril. On those facts, the Supreme Court held that the matter should have gone to the jury as to the negligence of the defendant.

■ Because Haynes had invited Odum to assist him in the erection of the antenna, insofar as the work to be performed was concerned, Haynes owed to Odum the duty to exercise ordinary and reasonable care in the performance of the task at hand. This we believe to be the gist of the holding in Hatcher v. Cantrell, supra. In that case, plaintiff and defendant were hastily attempting to remove a car from a garage while a nearby building was in flames. While plaintiff was holding the garage door, defendant backed into and over plaintiff. The Trial Court had directed a verdict on the theory that plaintiff was a mere volunteer and defendant only owed the duty not to willfully injure plaintiff and therefore there was no jury issue. The Supreme Court held that plaintiff was, by implication, an invitee to the performance of the task of removing the car from the garage and that as such work invitee, he was owed the duty of ordinary care and prudence under the circumstances and whether there was a breach of that duty was a question for the jury. The fact that the injury in the *Hatcher* case took

place on the premises occupied by and under the control of the defendant was, in our opinion, of no great importance in determining the duty owed by defendant to plaintiff. The injury was caused by the overt act of the defendant and not by any defect in the premises. The duty arose out of the invitation to assist in the performance of a task, and not because of the incidental fact that it was to be performed on the premises of the defendant. We draw this distinction to show that circumstances create and alter obligations. If the invitation is to the premises of the defendant over which he exercises control, the owner or occupier thereof must maintain the premises in a reasonably safe condition. If the invitation is to assist in the performance of a task, it matters not a whit where the task is being performed, for the inviter must, in his conduct in the performance of the task, exercise ordinary care under the circumstances. This we think is also the Court's holding in the Rogers v. Garrett case, supra. Thus defendant Haynes owed no duty to maintain the utility poles, but was under the duty to afford Odum, as a work invitee, ordinary care and prudence under the circumstances.

As far as the defendant Haynes is concerned, we are now to the issue of whether or not there is any proof in this record of the negligence of Haynes in the performance of that duty.

■ In every case of negligence, unless it is one involving the doctrine of *res ipsa loquitur*, the negligence of the defendant must be shown. The doctrine of *res ipsa loquitur* is not applicable to the instant case. In this case, the proof shows without doubt that all agreed and planned to move the antenna from the inside corner of the porch to its outside corner. Unless the defendant Haynes deviated from this plan by some act of negligence or failure to act there can be no recovery by the plaintiff. If there was no deviation from the preagreed plan, the act of any one of them would be the act of all. The perti-

nent portion of Odum's testimony regarding the alleged negligent acts of Haynes is as follows:

Q. Now, when you took your position on the lower porch, was it necessary for anyone to do anything before you got hold of the pole?

A. Yes, sir.

Q. Who did what?

A. The pushup was leaning in the corner, and it had to be brought out. I was going to stand around this support pole on the back porch, hold around it and Gary (Haynes' nephew) was going to bring it out where I could hold it, and I was going to steady it, and Gary Haynes, on the second floor was going to steady the pole.

Q. Who brought it out where you could hold it?

A. Gary Haynes.

Q. How did he do that?

A. He just pulled it out away from the wall.

\* \* \* \* \* \*

Q. When Gary Haynes moved it out to where he could get hold of it, tell us exactly how he did that; did he pick up the pole off the ground, or tilt it out to you, or how did he do it?

A. No, sir. All he had to do was bring it from the wall, just lean it out. He didn't have to pick it up in any way.

Q. And did he do that?

A. Yes, sir.

\* \* \* \* \* \*

Q. Was anything on the bottom of the pushup pole, any base of any kind?

A. No, sir. It was just pipe.

\* \* \* \* \* \*

Q. Now, did Gary get the antenna out to you?

A. Yes, sir. He had to raise it out before I could reach it.

Q. And did you then get hold of the support or mast of the antenna?

A. Yes, sir.

\* \* \* \* \* \*

Q. Now, after you had hold of the pole, the support pole for the antenna, the mast, tell us what happened?

A. Gary Haynes and I were going to steady this pole while Mr. Haynes slid it out.

Q. What, if anything, did Mr. Haynes do?

A. When Mr. Haynes moved the pole, that's when the accident occurred.

Q. Tell us what he did and how he did it.

A. He was down—I couldn't see Mr. Haynes the way I was standing with the pole, holding around the support pole on the back porch, but he was down at the bottom of the post, going to slid (sic) it out.

Q. Could you feel whether he slid it out any or not?

A. Yes; I felt it when it moved.

Q. What happened when he moved it?

A. That's when I received the severe electrical shock.

THE COURT: What was Gary doing at that time, he was above you, wasn't he?

A. Yes, sir.

THE COURT: Gary had let go of what he was doing?

A. No, sir. He was still there to steady the pole.

THE COURT: Did he still have hold of it?

A. As far as I know. I couldn't see. I was under—

THE COURT: (Interposing) You don't know then what Gary was doing exactly, or do you?

A. Well, that was what we had said we would do. We were going to steady it while Mr. Haynes moved it.

THE COURT: Moved it out?

A. Yes, sir.

THE COURT: All right.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Mr. Odom, after the pole was placed in a position where you could get hold of it, did the pole remain in that position until Mr. Haynes moved the base of it?

A. Yes, sir.

Q. And at any time up until the time you were injured, received the shock, did the pole fall or lean in any direction?

A. No, sir.

From the foregoing it is as evident to us as it was to the Trial Judge that there was no deviation from that which the parties had planned to do. Haynes did exactly what they all agreed he would do. It was only the result of the act that was not agreed upon by the actors. There has been a failure of a showing of any act of negligence on the part of Haynes upon which a recovery could be predicated.

Counsel for plaintiff argues in his brief that Haynes was burdened with a greater duty than Odum to ascertain where the top of the antenna was located in relationship to the electrical lines as Odum testified that he could not see the top of the antenna at the time he was steadying it on the ground floor porch. If this argument was valid would it not also place the greater duty on Odum to see that the radials of the true antenna, when he alone attached them on the roof, were of sufficient height to clear the lines when the entire antenna was erected according to plan? Since, as we see the record, there has been no showing of any deviation by Haynes from the agreed upon plan of action, there can be no liability of Haynes to Odum.

So much of appellants first Assignment of Error directed to the action of the Trial Court in directing a verdict for the defendant Haynes is overruled.

Insofar as the issue of the defendants Kotlers' liability or negligence is concerned, in addition to the previous description of the proof, there was introduced in evidence the recorded easement for electrical transmission lines over the Kotlers' land. Also, plaintiff's expert witness in the electrical transmission field testified to the effect that the electrical facility, that is, the poles, guys, wires and transformers, did not in his opinion meet the "high standards recognized in the electrical distribution field."

Counsel for appellant strongly argues that since the electrical transmission lines were installed to furnish current for use in the defendants' apartment complex, defendants thereby became suppliers of electricity and were burdened with the obligations and duty of care required of a supplier of electricity. The case of International Harvester Co., et al. v. Sartain (1948 W.S.) 32 Tenn.App. 425, 222 S.W.2d 854, is relied upon for this proposition. Further, that since the case did go to the jury as to the admitted supplier of electricity, the utility company, the case against the Kotlers as supplier of electricity should have gone to the jury.

We are of the opinion that the Kotlers are not, in law, considered to be suppliers of electricity. In International v. Sartain, supra, International had contracted to have a large manufacturing plant built near the city of Memphis. Virginia Engineering

Co. was the general contractor on the job. Memphis Light, Gas & Water Division had erected a temporary high voltage line at the instruction of International on the premises. Sartain, a workman on the job, was injured when he came in contact with another temporary high voltage line erected by the utility company on the instructions of Virginia. A jury verdict was rendered against International and Virginia. The jury returned a not guilty verdict for the defendant Memphis Light, Gas & Water Division. The pertinent facts of that case are that International by specific contract was obligated to furnish water to the job site. In furtherance of this contractual obligation, International had the utility company run a temporary high voltage line to its water well. International contracted with Virginia that Virginia was to furnish electricity to all other contractors on the job site. Virginia had the utility company run a temporary high voltage "take off" line from the water well line to the foundation of one of the buildings under construction. At Virginia's instructions the high voltage "take off" line was located so as to be dangerously close to the roof line of the building when constructed. When the building was nearing completion and Sartain was working at the roof line he came in contract with the power line and was injured. International never relinquished the right to enter upon any part of the entire premises either to do work itself or through other independent contractors.

On the facts of the case, on appeal, the Court reached the conclusion that International was a supplier of electricity and burdened with the duties of such. This conclusion was reached on the finding that International had by contract, implication or necessity agreed to furnish temporary high voltage line to the job site for the benefit of all contractors, subcontractors or remote subcontractors and that this duty to furnish temporary high voltage power in a proper manner was a non-delegable one. Therefore, the act of Virginia in having the temporary "take off" line installed in a negligent manner was the act of International.

We are of the opinion that the International case can be fairly distinguished from the instant case on several points. First, it involved a contract to furnish high voltage current. Even if the Kotlers were considered to be suppliers of electricity, and we say they are not, they never, by implication or otherwise contracted to supply 7200 volts to anybody. Second, the case involved various construction contracts and International certainly knew that the work was being performed. No proper proof is found· in this case that the Kotlers knew that the plaintiff was erecting an antenna near the utility lines. Third, the lines involved in the controversy were temporary lines installed at International's instructions. Fourth, no easement was involved whereby the grantor relinquished rights.

We hold that the giving of a permanent easement to a utility company for the purpose of installation and maintenance of an electrical transmission system, whether for the use of the grantor or ·others, over the lands of the grantor does not, of itself, render the grantor a supplier of electricity. To hold otherwise would mean that every homeowner or apartment owner who permitted a power easement across his property would thereby become a supplier of electricity and would be charged with the duty to the public in general to properly install the lines and maintain them without the vaguest notion of how to do it. We do not believe that such result is or should be the law.

So much of the first Assignment of Error directed to the Court's action in sustaining the motion for a directed verdict as to the defendants Kotler is overruled.

■ Counsel for appellant complains of the admission in evidence and in the reading by the Court in its charge to the jury the following ordinance of the City of Memphis:

"29–1. Compliance with National Electrical Safety Code. All poles, wires,

and conduits authorized or required by this chapter shall be installed and maintained in accordance with the applicable provision of the National Electrical Safety Code, 1965 Edition, and it shall be a misdemeanor for any person or corporation to have, use or maintain within the limits of the city any such installation that does not meet such requirements as to quality or safety. Compliance with the National Electrical Safety Code shall be a complete compliance with all requirements of the city for the construction, maintenance and operation of the poles, wires, conduits and other facilities in the city."

It is contended that this was harmful because the ordinance was invalid and unconstitutional for the reason that (a) it refers to the 1965 Edition of the National Electrical Safety Code when in fact there is no such edition (by ordinance adopted after Odum's injury, the misnomer in the foregoing ordinance in regard to its reference to the National Electrical Safety Code was corrected by amendment to read "National Electrical Safety Code, 1961 Editions as amended December 15, 1965"), (b) it is vague and indefinite, and (c) it is in conflict with the common law.

We need not pass on the validity of the complained of city ordinance. The arguments of counsel are directed to the invalidity of the ordinance and not to how its introduction in this case prejudiced the plaintiff. Any prejudice to plaintiff is not self evident to us. In fact, we are unable to perceive how its introduction was prejudicial to plaintiff. First, the ordinance placed a duty upon the defendant, not the plaintiff, and the violation of that duty is a misdemeanor, which, as was charged to the jury by the Court, would be negligence per se on the part of the defendant utility company. Second, the ordinance does not pretend to state that a compliance therewith relieves anyone of tort liability for failure to exercise the highest degree of care, or that compliance therewith is *ipso facto* the use of the highest degree of care. Third, the Court charged the jury that it was the duty of the utility company to exercise the highest degree of care which skill and foresight can obtain in the principal conduct of its business in the erection, construction, location and maintenance of its facilities, including poles, transformers, and wires used in the distribution of its electricity, so that all people, who might reasonably be expected to come in contact with electrical transmission wire, may not be injured. Further, the Court charged the jury that compliance with the standards contained in the National Electrical Safety Code is not conclusive on the question of the degree of care owed by the defendant. Fourth, the National Electrical Safety Code that was introduced into evidence and about which both expert witnesses testified was the correct code in existence at the time of the injury. Both expert witnesses recognized the National Electrical Safety Code as an applicable standard in the industry with which all experts in their field must be familiar. Since the issue presented by the expert witnesses was heard and determined by the jury we see no reason to detail that testimony in this opinion. Appellant's second Assignment of Error is overruled.

■ Appellant's third Assignment of Error faults the Trial Court for admitting into evidence over the objection of the plaintiff, certain provisions of the National Electrical Code governing the erecting of citizens' band radio antennas and reading same to the jury. The National Electrical Code is not to be confused with the National Electrical Safety Code. The National Electrical Safety Code pertains to the transmission of current over and the installation of electrical distribution systems only. The National Electrical Code pertains to the proper use of the power after it reaches the user and includes regulations concerning the installation of electrical devices including radio antennas.

Under authorization of T.C.A. §§ 53–2413 and 53–2536, the State Fire Marshal,

acting for the Commissioner of Insurance and Banking, did adopt the National Electrical Code, 1965 Edition. However, counsel for appellant argues that at the time of the accident in question the State Fire Marshal had no duties or power to regulate respecting public safety apart from the hazards of fire and explosions and therefore was not authorized to regulate the erection of radio antennas. Further, any regulation which exceeded the Fire Marshal's authority is void and should not have been considered by the jury. Counsel relies upon the case of Bivin v. Southern Oil Services, Inc. (1965 M.S.) 54 Tenn.App. 678, 394 S.W.2d 141, for this proposition. We agree with the holding in the *Bivin* case that at the time of that decision and at the time of the injury in this case, the State Fire Marshal had no power to regulate apart from the hazards of fire and explosion. However, we do not agree with the argument of counsel that the installation of electrical devices in buildings including outside radio antennas, does not come under the category of fire hazards.

■ This Court will take judicial knowledge that a common cause of fire is the improper installation or use of electrical devices. Therefore, we are of the opinion that the introduction of the National Electrical Code was proper. We find no error in its introduction, especially in view of the fact that the Court charged the jury that a violation of the State Fire Marshal's regulations by the plaintiff would not constitute negligence per se on the part of the plaintiff, but that the regulations were simply to be weighed with all the other evidence in determining whether or not plaintiff was guilty of any negligence. Appellant's third Assignment of Error is overruled.

It is strongly insisted that the issue of gross negligence on the part of the utility company should have been submitted to the jury and that the Trial Judge was in error in withdrawing such issue. The case of Martin v. Town of McMinnville (1962 M.

S.) 51 Tenn.App. 503, 369 S.W.2d 902 and Phelps v. Magnavox Company of Tennessee, Inc. (1970 E.S.) Tenn.App., 466 S.W.2d 226 are some of counsel for appellant's authority for this proposition.

In the Martin case, a jury verdict was rendered against the power company and on appeal the power company assigned as error the refusal of the Trial Judge to direct a verdict in its favor because, in appellant's view, the plaintiff was guilty of proximate contributory negligence. The Middle Section of this Court held that the case involved the possible gross negligence of the defendant and the matter should have been submitted to the jury. In the *Magnavox* case, the Trial Court was reversed for directing a verdict for the defendants. Both cases involved workmen who were electrocuted while working in close proximity to high voltage overhead wires.

■ A study of these cases reveals many factual similarities to the instant case, but it also reveals certain prominent distinguishing facts. In both *Martin and Magnovox*, supra, the proof clearly showed that the power company defendants had erected high voltage transmission lines in clear violation of City Ordinances or applicable national electrical codes. Further, in both cases the power company defendants had been notified that the work would be done in close proximity to their lines. In the case of Turner v. Tennessee Valley Electric Cooperative (1955 W.S.) 40 Tenn.App. 54, 288 S.W.2d 747, which is also cited in appellants' brief, the power company had been notified of the work being done in the vicinity of its lines which were erected in violation of a state statute. In the instant case, the utility company had no notice of the antenna work to be performed in close proximity to its lines. There is no proof in this record which shows that there was a clear violation by the defendant utility company of any of the applicable local or national standards. The distance of the utility pole

from the apartment building, the height of the lines and their clearance from the apartment building, etc. met or exceeded code specifications. The plaintiff sought to show through his expert witness, and counsel for appellant argues, that there were existant other and safer methods of locating the poles and wires (such as putting the wires underground,) and since these other methods, although not specifically required in the National Electrical Safety Code, were not used, the Code was violated because the code provides, in effect, that the rules are intended to be modified whenever equivalent or safer construction can be more readily provided in other ways and that all work shall be installed and maintained so as to reduce hazards to life as far as practicable. We do not agree with the conclusion of counsel that if the utility company failed to erect the system in the safest manner conceivable that such failure would constitute gross negligence. However, it is true that if the utility company failed to conceive the safest manner of construction of the electrical distribution system under all the circumstances, they may have been guilty of ordinary negligence and the jury in this case was charged to that effect. However, such failure by the utility company would not constitute gross negligence. Gross negligence is not characterized by inadvertence. It is a negligent act done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law. Inter-City Trucking Co. v. Daniels (1944) 181 Tenn. 126, 178 S.W.2d 756; Stagner v. Craig (1929) 159 Tenn. 511, 19 S.W.2d 234. We find no proof of gross negligence in this case and are of the opinion that the Trial Court was correct in withdrawing that issue from the jury. Appellants' fourth Assignment of Error is overruled.

Some of the plaintiff's Special Requests to Charge were given by the Court and some refused. We have carefully reviewed the charge as given by the Court and find it to be entirely fair to both parties. The jury was fully and properly instructed as to the law applicable to the case. The remaining Assignments of Error which are directed to the Court's charge are overruled.

It therefore results that the judgment of the Trial Court is affirmed with costs of appeal adjudged against the appellant and the surety on his bond.

CARNEY, P. J., and MATHERNE, J., concur.